CA NO. 24-2371

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| LEON ABEL GONZALEZ, | DC NO. CR 2:23-cv-10554-DSF |
| Petitioner-Appellant, | |
| v. | |
| JUAN HERRERA, Bureau of Prisons Residential Reentry Manager for Long Beach, in his official capacity; and COLLETTE PETERS, Director of the Federal Bureau of Prisons, in her official capacity | |
| Respondents-Appellees. | |

**APPELLANT'S OPENING BRIEF**

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF CALIFORNIA

HONORABLE DALE S. FISCHER
United States District Judge

CUAUHTEMOC ORTEGA
Federal Public Defender
HUNTER HANEY
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081
Email: hunter_haney@fd.org
Attorneys for Petitioner-Appellant

**TABLE OF CONTENTS**

                                                                    **Page**

I.    INTRODUCTION ................................................................1

II.    QUESTION PRESENTED..................................................3

III.    STATEMENT OF ADDENDUM .......................................3

IV.    STATEMENT OF JURISDICTION .................................3

V.    STATEMENT OF THE CASE .........................................4

    A.    The First Step Act.................................................4

    B.    Gonzalez's Extensive Rehabilitative Efforts During and After His Incarceration. ...........................................5

    C.    Gonzalez Seeks Habeas Relief for Refusal to Apply his FSA Earned-Time Credits to His Term of Supervised Release. ...................7

    D.    The District Court Denies Habeas Relief. ...........................9

VI.    SUMMARY OF ARGUMENT......................................10

VII.    ARGUMENT....................................................................13

    A.    Standard of Review ................................................13

    B.    The District Court Erred in Concluding That Gonzalez Could Not Apply His FSA Earned-Time Credits to Reduce His "[T]ime [I]n" Supervised Release Under 18 U.S.C. § 3632(d)(4)(C). .......................13

        1.    Section 3632's plain language requires that ETCs be applied to reduce "time in" supervised release.........................13

        2.    The broader statutory context supports Gonzalez's interpretation. ...........................21

        3.    Gonzalez's reading of section 3632 best aligns with the FSA's legislative history.........................25

        4.    The government's policy arguments are meritless. ..................27

i

**TABLE OF CONTENTS**

**Page**

5.     Gonzalez's position is consistent with the ends of federal sentencing...................................................................................31

6.     This issue has divided district courts, but those opinions adopting Gonzalez's reading are more persuasive. ..................32

7.     Any ambiguity should be resolved in favor of Gonzalez under the rule of lenity. ...........................................................35

8.     The district court's reference to the BOP's own regulations does not justify a different result. ...........................................35

VIII.  CONCLUSION...............................................................................39

INDEX OF ADDENDUM...........................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Abramski v. United States*,
573 U.S. 169 (2014).................................................................36

*Alaimalo v. United States*,
636 F.3d 1092 (9th Cir. 2011) ....................................................3

*Alpine Glass, Inc. v. Illinois Farmers Ins. Co.*,
643 F.3d 659 (8th Cir. 2011) ....................................................14

*Auer v. Robbins*,
519 U.S. 452 (1997).................................................................37

*Bifulco v. United States*,
447 U.S. 381 (1980).................................................................35

*California v. Trump*,
963 F.3d 926 (9th Cir. 2020) ..............................................14, 19

*Cohen v. United States*,
No. 20-CV-10833 (JGK), 2021 WL 1549917 (S.D.N.Y. Apr. 20,
2021) ...................................................................................33

*Concepcion v. United States*,
597 U.S. 481 (2022).................................................................28

*Cook v. Hemingway*,
No. 21-CV-11711, 2022 WL 3568571 (E.D. Mich. Aug. 18, 2022) .................32

*Crandon v. United States*,
494 U.S. 152 (1990).................................................................36

*Davis v. Crabtree*,
109 F.3d 566 (9th Cir. 1997) ....................................................35

*Delek US Holdings, Inc. v. United States*,
32 F.4th 495 (6th Cir. 2022) ..............................................10, 16

# TABLE OF AUTHORITIES

**Page(s)**

*District of Columbia v. Heller*,
554 U.S. 570 (2008)..............................................................................19

*Dyer v. Fulgham*,
No. 21-cv-299, 2022 WL 1598249 (E.D. Tenn. 2022) ..........................16, 31, 32

*Ector v. Engleman*,
No. 22-cv-6044-FLA (JPR), 2023 WL 6969784 (C.D. Cal. July 28,
2023) .................................................................................................33

*Gratton v. Dismas Charities, Inc.*,
No. 3:20-00509, 2021 WL 4163992 (M.D. Tenn. Aug. 20, 2021) ....................33

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
140 S. Ct. 789 (2020)..............................................................................36

*Gunderson v. Hood*,
268 F.3d 1149 (9th Cir. 2001) .................................................................37

*Harrison v. Fed. Bureau of Prisons*,
No. 22-14312-Scola, 2022 WL 17093441 (S.D. Fla. Nov. 21,
2022) .................................................................................................34

*Ileto v. Glock, Inc.*,
421 F. Supp. 2d 1274 (C.D. Cal. 2006) .......................................................15

*In re Flores*,
735 F.3d 855 (9th Cir. 2013) (en banc) .......................................................17, 25

*Jones v. Ford Motor Co.*,
85 F.4th 570 (9th Cir. 2023) ...................................................................18

*Kisor v. Wilkie*,
588 U.S. 558 (2019)................................................................................37

*Lallave v. Martinez*,
No. 22-CV-4136, 2022 WL 7578794 (E.D.N.Y. Oct. 13, 2022) .......................32

*Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*,
522 U.S. 479 (1998)................................................................................17

iv

# TABLE OF AUTHORITIES

**Page(s)**

*Neal v. U.S. Penitentiary Atwater*,
585 F. App'x 730 (9th Cir. 2014) (unpublished)................................37

*Randolph v. Hudson*,
No. 22-3049-JWL, 2022 WL 1909051 (D. Kan. June 3, 2022)........................33

*Russello v. United States*,
464 U.S. 16 (1983).................................................................38

*Russo v. Caravajel*,
No. CR 20-47, 2022 WL 16749036 (E.D. Pa. Nov. 7, 2022) ..........................32

*Sacora v. Thomas*,
628 F.3d 1059 (9th Cir. 2010) .....................................................37

*Sandoval v. Sessions*,
866 F.3d 986 (9th Cir. 2017) ......................................................37

*Simmons v. Himmelreich*,
578 U.S. 621 (2016)................................................................11

*Toor v. Lynch*,
789 F.3d 1055 (9th Cir. 2015) .....................................................24

*United States v. Begay*,
33 F.4th 1081 (9th Cir. 2022) (en banc) ...........................................30

*United States v. Calabrese*,
No. 11-cr-437, 2023 WL 1969753 (N.D. Ohio Feb. 13, 2023)....................33, 34

*United States v. Calhoun*,
No. 3:08-CR-77-DPJ-LGI, 2023 WL 7930053 (S.D. Miss. Nov.
16, 2023) .........................................................................33

*United States v. Davis*,
588 U.S. 445 (2019)................................................................35

*United States v. Gallegos*,
613 F.3d 1211 (9th Cir. 2010) .....................................................16

v

# TABLE OF AUTHORITIES

**Page(s)**

*United States v. Granderson*,
  511 U.S. 39 (1994)................................................................35

*United States v. Havis*,
  907 F.3d 439 (6th Cir. 2018) ...............................................36

*United States v. Haymond*,
  588 U.S. 634 ........................................................................27

*United States v. Hemme*,
  476 U.S. 558 (1986).............................................................14

*United States v. Johnson*,
  529 U.S. 53 (2000)...............................................................31

*United States v. Kowalczyk*,
  805 F.3d 847 (9th Cir. 2015) ...............................................38

*United States v. LKAV*,
  712 F.3d 436 (9th Cir. 2013) ...............................................20

*United States v. Lopez*,
  998 F.3d 431 (9th Cir. 2021) ...........................13, 19, 21, 28

*United States v. Mack*,
  164 F.3d 467 (9th Cir. 1999) ...............................................19

*United States v. Paulson*,
  68 F.4th 528 (9th Cir. 2023) ..........................................18, 22

*United States v. Simons*,
  375 F. Supp. 3d 379 (E.D.N.Y. 2019)..................................26

*United States v. Smith*,
  No. 1:17-cr-20753, 2022 WL 17718413 (E.D. Mich. Dec. 15,
  2022) ....................................................................................32

*United States v. Trident Seafoods Corp.*,
  92 F.3d 855 (9th Cir. 1996) .................................................24

# TABLE OF AUTHORITIES

**Page(s)**

*United States v. White,*
984 F.3d 76 (D.C. Cir. 2020) .................................................................26

*United States v. Wirsing,*
943 F.3d 175 (4th Cir. 2019) .................................................................26

*Wilson v. Belleque,*
554 F.3d 816 (9th Cir. 2009) .................................................................13

*Yanagihara v. Derr,*
No. CV 22-00145 JAO-RT, 2023 WL 2163685 (D. Haw. Feb. 22,
2023) ........................................................................................................33

*Young v. Kenny,*
907 F.2d 874 (9th Cir. 1989) ...................................................................3

## Federal Statutes and Constitutional Provisions

18 U.S.C. § 3583(a) ...........................................................................4, 28

18 U.S.C. § 3585(b) .................................................................................19

18 U.S.C. § 3624(b)(1)..............................................................................20

18 U.S.C. § 3624(c) ...................................................................................4

18 U.S.C. § 3624(c)(1)................................................................................4

18 U.S.C. § 3624(g) .................................................................................14

18 U.S.C. § 3624(g)(1)(A)..............................................................24, 25, 30

18 U.S.C. § 3624(g)(2)........................................................................16, 17

18 U.S.C. § 3624(g)(3)........................................................................*passim*

18 U.S.C. § 3632....................................................................13, 24, 25

18 U.S.C. § 3632(a) ...................................................................................5

18 U.S.C. § 3632(d).........................................................................14, 15, 30

# TABLE OF AUTHORITIES

**Page(s)**

18 U.S.C. § 3632(d)(4)..........................................................................4

18 U.S.C. § 3632(d)(4)(A) ..............................................................26, 33

18 U.S.C. § 3632(d)(4)(C) ...........................................................*passim*

18 U.S.C. § 3632(d)(4)(D) ..................................................................26

18 U.S.C. § 4105(b) ...........................................................................20

18 U.S.C. § 4114(e) ...........................................................................20

28 U.S.C. § 1291 .................................................................................4

28 U.S.C. § 1331 .................................................................................3

28 U.S.C. § 1346 .................................................................................3

28 U.S.C. § 1651 .................................................................................3

28 U.S.C. § 2201 .................................................................................3

28 U.S.C. § 2202 .................................................................................3

28 U.S.C. § 2241 ........................................................................1, 3, 13

28 U.S.C. § 2253 .................................................................................4

CARES Act, Pub. L. No. 116-136, 134 Stat. 281 (2020) ...............5, 6, 7

Fed. R. App. P. 4(a)(1)(A) ...................................................................3

First Step Act, Pub. L. No. 115-391, 132 Stat. 5194 (2018) ...........*passim*

U.S. Const. art. I, § 9, cl. 2..................................................................3

**Regulations**

28 C.F.R. § 523.40(b) ........................................................................35

28 C.F.R. § 523.42(b) ..........................................................................5

# TABLE OF AUTHORITIES

**Page(s)**

28 C.F.R. § 523.44(b)(1)............................................................................30

28 C.F.R. § 523.44(d) ...............................................................................35

28 C.F.R. §§ 542.13-542.14(c) ....................................................................8

28 C.F.R. § 542.15 .......................................................................................8

28 C.F.R. § 542.15(a)...................................................................................8

28 C.F.R. § 542.15(b) ..................................................................................8

28 C.F.R. § 542.18 .......................................................................................8

**Other Authorities**

164 Cong. Rec. H10346-04, 2018 WL 6710302 (Dec. 20, 2018).....................12, 25

164 Cong. Rec. H10396-02, 2018 WL 6710307 (Dec. 20, 2018).....................12, 27

164 Cong. Rec. S7745-01, 2018 WL 6624756 (Dec. 18, 2018) ............................26

Am. Heritage Dictionary of English Language 1457 (4th ed. 2000) .....................14

*Black's Law Dictionary* (11th ed. 2019)...................................................17

*Black's Law Dictionary* (8th ed. 2004).....................................................15

Br. of Sens. Durbin, Grassley, Booker, and Lee as Amici Curiae at 2,
   *Terry v. United States*,
   No. 20-5904, 141 S. Ct. 1858 (2021) ................................................25

*In*, Merriam-Webster..................................................................................16

*Merriam-Webster's Collegiate Dictionary* (11th ed. 2003) ............................10, 16

*Toward*, Merriam-Webster .......................................................................10, 15

*Toward*, The Oxford Modern English Dictionary (2d ed. 1996)............................15

*Toward*, Webster's II New Riverside University Dictionary (1984) .....................15

x

# TABLE OF AUTHORITIES

**Page(s)**

United States Sentencing Commission, 2023 Sourcebook of Federal
Sentencing Statistics, (2024)..................................................................................23

x

## I. INTRODUCTION

This appeal concerns a singular question of statutory interpretation regarding the First Step Act ("FSA"). That question is straightforwardly answered by reference to the FSA's plain text, context, and purpose. The FSA provides for a system of "[t]ime credits" to be earned by eligible, incarcerated individuals that "shall be applied toward *time in* prerelease custody or supervised release." 18 U.S.C. § 3632(d)(4)(C) (emphasis added).

There is no question Leon Abel Gonzalez was one such eligible individual. Throughout his term of incarceration, he availed himself of the benefits of the FSA's time-credit program and otherwise pursued every rehabilitative opportunity afforded him. He completed his GED and worked hard to complete a wealth of educational and vocational courses. Consequently, by February 1, 2024, he had earned 610 days of time credits. However, the Bureau of Prisons (the entity charged with administering the time-credit program) only applied 237 days of credit to his term of prerelease custody, refusing to acknowledge Gonzalez's entitlement to use his remaining 373 days of credits "toward [his] time in…supervised release." After exhausting his administrative remedies, Gonzalez filed a habeas corpus petition under 28 U.S.C. § 2241, seeking an order that his hard-earned credits be applied to his term of supervised release consistent with the FSA.

1

The government opposed and the district court denied Gonzalez's petition, adopting the government's flawed, antitextual argument that neither section 3632(d)(4)(C), nor any other provision, actually permits the use of credits toward "time in…supervised release" at all. Rather, an incarcerated individual can only get closer to the start of supervision, or shorten the "time before" their post-release supervision.

But Congress specifically required, using mandatory language, that credits be applied toward "time in[,]" not "time before," supervised release, and the district court was wrong to rewrite the statute to operate in that manner. Allowing the full use of credits also aligns best with the text and structure of adjacent provisions of the FSA. The court's strained reading would lead to the same statutory language being applied to prerelease custody and supervised release differently. It would also undercut the statute's purposes: the FSA's time-credit system was precisely designed to incentivize offenders to work productively toward their rehabilitation. A time-credit system in which credits can only reduce time in imprisonment would be limited by statute to twelve months of imprisonment. 18 U.S.C. § 3624(g)(3). The construction adopted here would routinely result in unused credits for individuals such as Gonzalez, who, under the court's flawed interpretation of the statute, could only utilize less than half of his

2

earned credits. This outcome would drastically limit the efficacy of the FSA's incentive-based system in a manner contrary to congressional intent.

This Court should reverse the order denying Gonzalez's petition.

## II. QUESTION PRESENTED

Whether the district court properly declined to apply Leon Abel Gonzalez's First Step Act earned-time credits to his supervised release under 18 U.S.C. § 3632(d)(4)(C).

## III. STATEMENT OF ADDENDUM

The attached addendum includes pertinent authorities.

## IV. STATEMENT OF JURISDICTION

The district court had jurisdiction under Article I, § 9, cl. 2 of the U.S. Constitution and 28 U.S.C. § 1331 (federal question), § 1346 (US defendant), § 1651 (writs), §§ 2201–2202 (remedies), and § 2241 (power to grant writ). *See Young v. Kenny*, 907 F.2d 874, 875–77 (9th Cir. 1989) ("sole federal remedy" for deprivation of earned-time credits rests in habeas corpus).

After the district court denied habeas relief on April 2, 2024 (ER-3), Gonzalez filed a timely notice of appeal on April 12, 2024. (ER-177); *see* Fed. R. App. P. 4(a)(1)(A). Unlike in other habeas cases, a section 2241 petitioner need not obtain a certificate of appealability to appeal the denial of his petition. *Alaimalo v.*

3

*United States*, 636 F.3d 1092, 1096 (9th Cir. 2011). Therefore, this Court has jurisdiction under 28 U.S.C. §§ 1291 and 2253. *See id.*

## V. STATEMENT OF THE CASE

### A. The First Step Act

Federal sentences are for the most part comprised of a term of incarceration and a subsequent term of supervised release. *See, e.g.*, 18 U.S.C. § 3583(a). Typically, "a prisoner serving a term of imprisonment spends a portion of the final months of that term" in "[p]rerelease custody." 18 U.S.C. § 3624(c)(1). A term of prerelease custody is "not to exceed 12 months[.]" *Id.* It usually occurs in "a community correctional facility," a halfway house, or "[h]ome confinement." 18 U.S.C. § 3624(c). Thus, a federal sentence is usually served in the following sequence: imprisonment, then prerelease custody, and finally supervised release.

On December 21, 2018, Congress passed the First Step Act ("FSA"). Pub. L. No. 115-391, 132 Stat. 5194 (2018). The FSA established an earned-time credit ("ETC") program, providing that eligible individuals who participate in evidence-based recidivism-reduction programming ("EBRR") may earn fifteen days of credits to be applied toward their criminal sentences "for every 30 days of successful participation." 18 U.S.C. § 3632(d)(4).

Consistent with the FSA, the Attorney General and the Bureau of Prisons ("BOP") developed regulations for implementing the FSA, including a "risk and

needs assessment system" to evaluate the recidivism risk of incarcerated individuals. 18 U.S.C. § 3632(a). Under the resulting rules and regulations, eligible individuals were to receive retroactive FSA ETCs for EBBR participation starting on December 21, 2018. 28 C.F.R. § 523.42(b). Gonzalez was one such individual, earning 610 days of ETCs as of February 1, 2024. (ER-94 (government's concession that Gonzalez had accumulated 610 ETCs))[1]

## B.     Gonzalez's Extensive Rehabilitative Efforts During and After His Incarceration.

Gonzalez's ETCs are a product of his major rehabilitative strides since pleading guilty to a drug conspiracy in 2016. (ER-130) Gonzalez actively worked to better himself while incarcerated, including completing his GED and several educational and vocational courses. (*Id.*) In addition to courses for his GED, Gonzalez completed coursework in ceramics, business marketing, leather garments, nutrition, greeting cards, and HIV awareness. (ER-155) He also completed a drug education program. (ER-151)

In the midst of the COVID-19 pandemic, in November 2020, Gonzalez was released under the CARES Act, Pub. L. No. 116-136, 134 Stat. 281 (2020), to BOP-supervised home confinement at the Long Beach Residential Reentry

---

[1] There was no dispute below that Gonzalez was eligible to earn time credits under the FSA. However, the requirements for eligibility are set forth in more detail in Gonzalez's petition. (ER-131–36)

Management field office ("RRM"). (ER-128, 131) This decision was based on the BOP's determination that Gonzalez was vulnerable to COVID-19, had satisfactory conduct while incarcerated, and would not be a danger to the public. (ER-131)

Gonzalez remained on home confinement in good standing for three years thereafter, living with his sister and mother in Montebello, California, and reporting to his halfway house in El Monte, California, twice per week. (ER-131) Over this period, he continued to make substantial positive changes in his life all despite the restrictive limitations of BOP-supervised home confinement. (ER-142) To enhance his employability, Gonzalez gained a professional barbering license with the goal of obtaining a job in a barbershop his friend ran near his home. (*Id.*) He completed an electrician course, began a machine shop course, and was seeking approval to partake in more extensive coursework relating to welding and electrician work. (*Id.*)

But the ankle monitor required under the terms of his home confinement continually impeded his ability to find gainful employment. (ER-143) The four-month trucking permit he obtained to secure a trucking job, for instance, turned out to be a waste after his case manager informed him he could not accept a trucking job because he could not travel outside a 100-mile radius while wearing his ankle monitor. (*Id.*)

6

Despite these limitations, Gonzalez continued to productively use his time to reconnect with family, including his son, two daughters, and two baby grandsons. (*Id.*) While mindful of the lessons of his past struggles with addiction, Gonzalez had, by all indications, overcome those difficulties with eight years of sobriety and by cutting off the group of people who got him into trouble. (*Id.*)

**C.     Gonzalez Seeks Habeas Relief for Refusal to Apply his FSA Earned-Time Credits to His Term of Supervised Release.**

Gonzalez's expected release date from BOP custody was September 26, 2024. (ER-127, 136) Because the FSA only authorizes the use of 12 months of ETCs toward early transfer to supervised release, 18 U.S.C. § 3624(g)(3), Gonzalez began to informally advocate for himself as early as April 2022 to secure his transfer on the earliest possible date, *i.e.*, September 26, 2023. On several occasions between April 2022 until July 2023, Gonzalez contacted his RRM manager and counsel for the BOP requesting that the ETCs he had earned (ultimately 610 ETCs) be applied in the manner that the FSA requires. (ER-136–37) But after receiving no response from his RRM manager, BOP counsel told Gonzalez in July 2023 that his credits could not be applied without exhausting his

7

administrative remedies. (ER-137) Gonzalez then spent several months doing so. (ER-32–35, 137)[2]

After receiving no response at any stage, Gonzalez filed a habeas petition on December 18, 2023, in the Central District of California asking for his ETCs to be applied consistent with the FSA. (ER-120–76) He asked that his ETCs be applied to his remaining term in prerelease custody, and that any unused credits be applied to his five-year term of supervised release under 18 U.S.C. § 3632(d)(4)(C). (ER-138, 140; *see* ER-111 (Gonzalez's supervised release term was five years))

On February 2, 2024, the BOP acknowledged Gonzalez's accumulation of 610 days of ETCs and granted Gonzalez early transfer to supervised release. (ER-31, 94) It applied 237 of the 610 days of credits toward Gonzalez's pre-release custody, leaving 373 days of credits unused. (*Id.*)

The government filed an opposition to Gonzalez's petition on February 9, 2024. (ER-87–119) It urged the court to deny or dismiss Gonzalez's petition as

---

[2] Administrative exhaustion involves a four-step process, with a required waiting period between each step until a non-response is deemed a denial. *See* 28 C.F.R. §§ 542.13-542.14(c) (outlining first steps of exhaustion with RRM (BP-9), after informal complaint (BP-8)); 28 C.F.R. §§ 542.15(b), 542.18 (RRM's non-response within 20 days is deemed denial, with 20 more days to submit appeal (BP-10)); 28 C.F.R. §§ 542.15(a), 542.18 (Regional Director's non-response within 30 days is deemed denial, with 30 days to submit appeal to General Counsel (BP-11)). 28 C.F.R. §§ 542.15, 542.18 (General Counsel's non-response within 40 days is deemed denial).

moot, arguing that Gonzalez's early transfer to supervised release was the only relief to which the FSA entitled him. (ER-97–105) In other words, Gonzalez's remaining ETCs could not be applied to reduce his supervised-release term.

In reply, Gonzalez elaborated as to how the FSA's plain text, consistent with its legislative history and purpose, as well as the broader federal sentencing scheme, authorized the use of his remaining ETCs to reduce his term of supervised release. (ER-19–26) He also invoked the rule of lenity in the event the court considered the relevant provisions ambiguous. (ER-23) Gonzalez then showed that, although district courts were divided on the issue, the cases supporting his position were more persuasive. (ER-26–28) Finally, he explained that the government's off-hand citation to the BOP's own regulations waived any claim of regulatory deference, and, in any event, no deference was warranted. (ER-28–29)

## D.     The District Court Denies Habeas Relief.

On April 2, 2024, the district court filed an order dismissing Gonzalez's petition. (ER-3–7) After reviewing the text of 18 U.S.C. § 3632(d)(4)(C) and other relevant provisions, and surveying relevant cases, the court concluded that "the FSA does not allow time credits to be applied to reduce [Gonzalez's] term of supervised release." (ER-5)[3]

---

[3] The court declined to address whether Gonzalez adequately exhausted his administrative remedies. (ER-3–7; *see* ER-93, 103–04 (government's appearing to

## VI.  SUMMARY OF ARGUMENT

This Court should reverse the district court's denial of Gonzalez's habeas petition seeking application of his remaining First Step Act earned-time credits toward his supervised-release term.

The FSA's plain text states that "[t]ime credits earned…shall be applied toward time in prerelease custody or supervised release." 18 U.S.C. § 3632(d)(4)(C). The act of applying "credit…toward" something is a phrase conventionally understood as encompassing a "partial payment[,]" *Toward*, Merriam-Webster, https://www.merriam-webster.com/dictionary/toward (last visited Feb. 21, 2024), or "'a deduction from an amount otherwise due.'" *Delek US Holdings, Inc. v. United States*, 32 F.4th 495, 498 (6th Cir. 2022) (citing *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003)). Under 18 U.S.C. § 3632(d)(4)(C), earned credits are deducted from—or partially paid toward— "*time in*…supervised release." (emphasis added). This straightforward reading of the statutory text suffices to resolve the issue at hand. Indeed, "[a]bsent persuasive

---

argue Gonzalez had not exhausted administrative remedies, but citing no authorities)) As Gonzalez explained, it was unclear whether the government was formally raising an exhaustion defense, and any such argument was waived and meritless. Further, exhaustion was futile under the circumstances. (ER-32–35, 136–38) The court also refused Gonzalez's request that it exercise its broad equitable authorities to grant him relief irrespective of its interpretation of the FSA. (ER-7; ER-30–32) Gonzalez does not renew this request on appeal.

10

indications to the contrary," this Court must "presume Congress says what it means and means what it says." *Simmons v. Himmelreich*, 578 U.S. 621, 627 (2016).

Nonetheless, the district court disregarded the plain meaning of this statutory text and zeroed in on the word "toward," concluding that the inclusion of "toward" can only mean that credits can be applied to bring supervised release closer, instead of reducing the duration of supervised release. But the statute requires that time credits shall be applied toward "time in"—not "time before"—supervised release. Moreover, the district court's reading unacceptably requires reading "toward" in two different ways within the same provision, permitting credits to be applied directly "toward time in prerelease custody" to eliminate that term, but only allowing credits "toward time in…supervised release" to bring supervised release closer.

Nor does other language in the FSA, specifically the next sentence of 18 U.S.C. § 3632(d)(4)(C) or 18 U.S.C. § 3624(g)(3), support the district court's interpretation. These provisions, which govern transfers to supervised release, do not speak to—or even purport to exclude—application of time credits toward time in supervised release, above and beyond the use of credits to transfer eligible individuals to supervised release. Thus, these provisions do not override section 3632(d)(4)(C)'s otherwise clear textual mandate providing for time credits for "time in…supervised release."

11

The district court also ignored the FSA's legislative history and failed to heed the extent to which it supports Gonzalez's reading. The FSA was a consequential "reform measure" that served to limit recidivism and the effects of overly punitive sentencing outcomes. 164 Cong. Rec. H10346-04, H10360, 2018 WL 6710302 (Dec. 20, 2018) (statement of Rep. Bob Goodlatte). The FSA's time-credit provisions were carefully drafted. They were specifically amended to "expand the use of earned credits to supervised release." 164 Cong. Rec. H10396-02, H10399, 2018 WL 6710307 (Dec. 20, 2018) (statement of Rep. Sheila Jackson Lee). The design of FSA time credits was thus to provide incentives that would promote rehabilitation and prevent recidivism. Limiting the application of those credits in the way that the district court did here will invariably narrow the system's efficacy as a rehabilitation incentive, thus undermining its promise as a reform measure.

This Court has not yet weighed in on this important issue of statutory interpretation, one that has divided district courts. But as a review of those district court cases makes clear, the courts that have adopted Gonzalez's reading have afforded the most fidelity to the statutory text, context, and purpose of the FSA's time-credit system.

Finally, if this Court remains uncertain, and believes that 18 U.S.C. § 3632(d)(4)(C) is ambiguous, the rule of lenity weighs in Gonzalez's favor. The

district court's invocation of the BOP's own implementing regulations in favor of a narrower reading of the time-credit statute does not change this conclusion: no deference to those regulations is warranted.

For these reasons, this Court should reverse and order that Gonzalez's time credits be applied to his time of supervised release.

## VII. ARGUMENT

### A.   Standard of Review

This Court reviews the denial of § 2241 petitions de novo. *Wilson v. Belleque*, 554 F.3d 816, 828 (9th Cir. 2009).

### B.   The District Court Erred in Concluding That Gonzalez Could Not Apply His FSA Earned-Time Credits to Reduce His "[T]ime [I]n" Supervised Release Under 18 U.S.C. § 3632(d)(4)(C).

> *1.    Section 3632's plain language requires that ETCs be applied to reduce "time in" supervised release.*

The plain text of the FSA unambiguously establishes that Gonzalez is entitled to apply the rest of his ETCs toward his time in supervised release. Accordingly, the FSA's unambiguous text is where this Court's analysis should begin and end. *See, e.g.*, *United States v. Lopez*, 998 F.3d 431, 435 (9th Cir. 2021) (analyzing the FSA, "[w]e begin with the statutory text and end there if the statute's language is plain." (citation omitted)).

The FSA provides several "incentives and rewards for prisoners to participate in and complete evidence-based recidivism reduction programs[.]" *See*

13

18 U.S.C. § 3632(d)(1)–(6). One such incentive is "[t]ime credits," which, once earned, affect the length of either "prerelease custody or supervised release" as follows:

> "(C) Application of time credits toward prerelease custody or supervised release.-- Time credits earned under this paragraph by prisoners who successfully participate in recidivism reduction programs or productive activities shall be applied toward *time in* prerelease custody or supervised release. The Director of the Bureau of Prisons shall transfer eligible prisoners, as determined under section 3624(g), into prerelease custody or supervised release."

*Id.* § 3632(d)(4)(C) (emphasis added).

Because the statute does not specifically define the relevant terms, this Court looks to dictionary definitions and relevant case law to determine the ordinary meaning of those terms. *See generally California v. Trump*, 963 F.3d 926, 944–45 (9th Cir. 2020).

The word "credit" generally refers to "directly reduc[ing] the amount" of something. *United States v. Hemme*, 476 U.S. 558, 561 n.1 (1986) ("A credit directly reduces the amount…that must be paid, dollar for dollar.") In the context of "incentives," *see* 18 U.S.C. § 3632(d), "credit" means a "'positive balance or amount remaining in a person's account.'" *Alpine Glass, Inc. v. Illinois Farmers Ins. Co.*, 643 F.3d 659, 665 (8th Cir. 2011) (quoting Am. Heritage Dictionary of English Language 1457 (4th ed. 2000)). Much like a tax credit reduces one's tax liability on a "dollar for dollar" basis, Gonzalez was entitled to a day-for-day

14

reduction of his sentence for every "credit" he earned. The government recognized that this is how the statute functions, at least as to Gonzalez's time in prerelease custody, when it applied 237 credits to reduce Gonzalez's sentence at a 1-to-1 ratio.

The remaining text accords with this interpretation. "Credits[,]" in section 3632(d)(4)(C), "shall" be "applied" to reduce a sentence, otherwise they stop being an "incentive or reward[]." 18 U.S.C. § 3632(d). "Apply" means "'[to] put to use with a particular subject matter.'" *Ileto v. Glock, Inc.*, 421 F. Supp. 2d 1274, 1288 (C.D. Cal. 2006), *aff'd*, 565 F.3d 1126 (9th Cir. 2009) (quoting *Black's Law Dictionary* 109 (8th ed. 2004)). That all credits earned be "put to use" is unambiguously required by the mandatory language that Congress selected here, signified by the word "shall[.]"

There are two ways for earners to then "put" their credits "to use": "toward time in prerelease custody" or "toward time…in supervised release." *Id.* § 3632(d)(4)(C). Dictionaries define "toward" as "a contribution to," *Toward*, The Oxford Modern English Dictionary (2d ed. 1996); "in . . . partial fulfillment of," *Toward*, Webster's II New Riverside University Dictionary (1984); or "for the partial payment of," *Toward*, Merriam-Webster, https://www.merriam-webster.com/dictionary/toward (last visited Feb. 21, 2024). It is also defined as "'a

15

deduction from an amount otherwise due.'" *Delek*, 32 F.4th at 498 (citing *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003)).

The preposition "in" reflected in the phrase "time in…supervised release" is a "function word" that necessarily indicates that the "purpose" of the "time" is "supervised release." *In*, Merriam-Webster, https://www.merriam-webster.com/dictionary/in (last visited July 23, 2024). And, as this Court has explained, the term "or" varies with context. *United States v. Gallegos*, 613 F.3d 1211, 1215 (9th Cir. 2010). It sometimes means "'either … or…but not both' and other times 'and/or.'" *Id.*

Altogether, this language requires that an incarcerated person's positive balance of earned time be put to partial fulfillment of, or as a deduction of, time served for the purpose of prerelease custody and/or supervised release. *See, e.g.*, *Dyer v. Fulgham*, No. 21-cv-299, 2022 WL 1598249, at *3 (E.D. Tenn. 2022) (statute "unambiguous[ly]" imposes this requirement). That is to say, regardless of the meaning of "toward," time credits are always contributed, partially or otherwise, to "time in" prerelease custody, or supervised release, or both.

When Gonzalez's FSA credits were ultimately applied on February 2, 2024, he was already on prerelease custody, with only 237 days remaining on that term. (*See* ER-94); 18 U.S.C. § 3624(g)(2) (prerelease custody is serving sentence on home confinement or at residential reentry center). Thus, the only way for

16

Gonzalez to fully use his 610 days of ETCs was crediting them partially toward the rest of his "time in" prerelease custody and then crediting the remaining balance toward his "time in" supervised release.

Despite this textual clarity, the government argued that "toward" doesn't mean that credits can reduce a term of supervised release, but only bring the start of supervised release closer. (ER-97–98) It based this argument solely upon the definition of the term "toward" as "'in the direction of; on a course or line leading to (some place or something)'" (*Id.* (citing *Black's Law Dictionary* (11th ed. 2019) and cases relying on this definition))

This position, which the district court adopted (ER-19–20), is misguided. The approach rests exclusively on a single definition of a single word ("toward") at the expense of all other words in the provision. One of the most fundamental principles of statutory interpretation is that "'words of a statute must be read in their context'"—not in isolation. *E.g.*, *In re Flores*, 735 F.3d 855, 859 (9th Cir. 2013) (en banc) (quotation omitted).

It also treats prerelease custody and supervised release differently, despite the lack of any textual directive to do so. *See Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 501 (1998) ("similar language contained within the same section of a statute must be accorded a consistent meaning"). ETCs unquestionably apply to reduce an individual's "time in prerelease custody,"

as the government acknowledged when it, in its own words, "appl[ied]" Gonzalez's ETCs to result in his "release from BOP custody on February 2, 2024." (ER-92; *see* ER-94 ("application of 237 days of ETCs" resulted in Gonzalez's release); ER-104 (similar)) Inexplicably, however, ETCs do not, per the government, similarly apply to reduce an individual's "time in…supervised release," even though that language appears in the same adjectival phrase modifying the same noun ("time") in the same sentence as "time in prerelease custody[.]" *But see, e.g.*, *United States v. Paulson*, 68 F.4th 528, 538 (9th Cir. 2023) (under series-qualifier rule, a straight-forward, parallel construction of series of words with single modifier is preferred).

The court's interpretation also renders the words "time in" superfluous and effectively rewrites the statute. It is well-established that "[s]tatutes must be interpreted and construed so that all the language used is given effect, with no portion rendered meaningless or superfluous." *Jones v. Ford Motor Co.*, 85 F.4th 570, 574 (9th Cir. 2023). If time credits could be used only to advance the start of prerelease custody of supervised release, Congress could have omitted the phrase "time in[.]" But it did not do so.

The district court's interpretation effectively rewrites the statute to require application of ETCs only "toward time before supervised release." But Congress deliberately chose the phrasing "time in" when drafting the statute, not "time

18

before." *See Trump,* 963 F.3d at 946 (declining to construe the term "unforeseen" as meaning "unknown" because "Congress' choice of words is presumed to be deliberate and deserving of judicial respect" (quotation omitted)). "If Congress meant § [3624(d)(4)(C)'s 'time in'] to mean ['time before'], it has the authority to amend the statute accordingly." *Lopez*, 998 F.3d at 444.

But it has not, so this Court is "bound to take Congress at its word." *United States v. Mack*, 164 F.3d 467, 472 (9th Cir. 1999) (quotation omitted). The linguistic clarity is irrefutable. If, for example, your employer provided parenting and family leave "credits" that "shall be applied toward time in parenting coursework or parental leave," your employer could not credibly say those credits could be applied only toward parenting coursework, thereby bringing your leave closer to happening. Those "credits" were obviously designed to be used as "credits" for actual "time" undertaking *both* of those designated activities. Thus, Gonzalez's reading of the FSA is most consistent with the natural and ordinary meaning of the words Congress chose. *See District of Columbia v. Heller*, 554 U.S. 570, 576 (2008) (normal and common-sense contemporary understanding of statutory language is preferable to "secret or technical meanings").

The deliberate nature of Congress's choice is also clear from its use of similar phrasing in other sentence-credit statutes that obviously apply to reduce the length of a sentence. *See* 18 U.S.C. § 3585(b) ("A defendant shall be given credit

19

*toward* the service of a term of imprisonment for any *time* he has spent *in* official detention prior to the date the sentence commences— (1) as a result of the offense for which the sentence was imposed; or (2) as a result of any other charge for which the defendant was arrested after the commission of the offense for which the sentence was imposed; that has not been credited *against* another sentence." (emphasis added)); 18 U.S.C. § 4105(b) ("offender shall be given credit *toward* service of the sentence for any *days* . . . spent *in* custody in connection with the offense or acts for which the sentence was imposed." (emphasis added)); 18 U.S.C. § 3624(b)(1) (prisoner may receive good time "credit *toward* the service of the prisoner's sentence." (emphasis added)); 18 U.S.C. § 4114(e) (providing individuals "credit *toward* service of [a foreign] sentence" for time in BOP custody (emphasis added)); *see also United States v. LKAV*, 712 F.3d 436, 440 (9th Cir. 2013) (This Court examines "the language of related or similar statutes to aid in interpretation").

Despite these arguments, the district court brushed aside Gonzalez's textual arguments, reasoning:

> If the word "toward" means to bring something closer to happening, then the clear reading is that the FSA time credits can be applied to bring something closer to occurring. The "something" in this instance is an individual's "time in prerelease custody or supervised release." In other words, credits can be applied to bring individuals closer to their "time in prerelease custody or supervised release." Under this definition the words "time in" maintains a non-superfluous meaning.

20

(ER-6)

This reasoning, however, is conclusory. While it mentions the phrase "time in[,]" it ultimately fails to account for the *role* of the phrase, or why "time in" could not be omitted (or substituted with the phrase "time before") without materially altering the purported meaning of the statute. Thus, the district court's textual analysis was fundamentally flawed.

Several aspects of the FSA are "far from a chef d'oeuvre of legislative draftsmanship." *Lopez*, 998 F.3d at 448 (M. Smith, J., concurring in part, dissenting in part, and concurring in judgment) (quotation omitted). But this is one area where Congress spoke clearly and definitively on the matter at hand. Section 3632(d)(4)(C)'s text mandates that ETCs be "applied toward time in prerelease custody or supervised release[.]" Therefore, Gonzalez's excess ETCs must be applied to his term of supervised release.

### 2. The broader statutory context supports Gonzalez's interpretation.

Lacking convincing textual support, the government leaned heavily on statutory context to bolster its reading below. But its contextual arguments were just as unconvincing.

The government argued that section 3632(d)(4)(C)'s further requirement that the BOP "'shall transfer eligible prisoners…into prerelease custody or supervised release'…has meaning only if earned-time credits affect the timing of that

21

transfer[.]" (ER-98) If a prison term could be reduced and supervised release eliminated, reasoned the government, "there would be no 'transfer.'" (*Id.*)

This argument is a straw man. ETCs unquestionably "affect the timing" of transfers. That is, of course, what the BOP correctly acknowledged when it applied part of Gonzalez's ETCs to transfer him to supervised release. But it is unclear how that unremarkable proposition supports the government's next assertion: that a complete application of ETCs, as Gonzalez seeks here, is not possible when a "transfer" to supervised release does not occur because the ETCs would satisfy the remaining portion of that term.

That point relies on the mistaken premise that a transfer to supervised release cannot occur only to have that term immediately considered satisfied. No part of section 3632(d)(4)(C) defines what a transfer is, or otherwise precludes this possibility. However, as a practical matter, this circumstance often occurs for transfers to prerelease custody because of the BOP's pervasive failures to timely apply ETCs. (*See* ER-138 (summarizing documented failures to apply FSA ETCs)) Yet the government does not argue that ETCs cannot be applied to reduce a term of prerelease custody under circumstances where *that* term is fully satisfied, despite the linguistic pairing of "prerelease custody" and "supervised release" within section 3632(d)(4)(C). *See, e.g.*, *Paulson*, 68 F.4th at 538.

22

Returning to the example of employer-provided parenting and family leave "credits" discussed above: what if, in addition to providing "credits…toward time in parenting coursework or parental leave," your employer also promised that, upon request, they "shall transfer eligible employees into parenting classes or parental leave" status? Interpreting that "transfer" provision as permitting application of credits toward "time in" parenting classes, but not "time in" parental leave, because the provision's alleged design is only to bring parental leave closer to happening, would be nonsensical.

A "transfer" is a "transfer," and only that. A transfer's scope, without a textual indication to the contrary, does not hinge on whether one's credits fully satisfy the purpose of that transfer. As such, requiring application of ETCs to "time in…supervised release" in no way deprives the same provision's "transfer" requirement of meaning.[4]

---

[4] Another fundamental reality bears noting. Provided that the BOP fulfills its statutory mandate to timely apply ETCs, *but see infra* Part VII.B.4 (describing how that is not occurring), terms of supervised release are usually sufficiently lengthy that they will rarely be entirely eliminated as a consequence of Gonzalez's interpretation of the FSA. *See* United States Sentencing Commission, 2023 Sourcebook of Federal Sentencing Statistics, (2024) Table 18, https://perma.cc/SB4P-QSZL (mean federal supervised release term is 47 months, or 1429 days). This case illustrates as much, as Gonzalez's remaining ETCs would only operate to reduce, not eliminate, his five-year supervision term by 373 days. This Court must "presume[]" that Congress legislated against this backdrop, and that it would have been clearer if it intended to exclude application of ETCs based

Section 3624(g)(3) does not support the government's narrow construction of the FSA, either. (ER-98–99) That provision specifies that the BOP "may transfer the prisoner to begin any such term of supervised release at an earlier date, not to exceed 12 months, based on the application of time credits under section 3632." This language does not prevent the application of time credits for another purpose above and beyond the 12 months of credits applicable to early transfer to supervised release.[5] In other words, permitting a 12-month reduction of prerelease custody, followed by an additional reduction of supervised release with any remaining credits, hardly renders this provision inoperable, and, in fact, is the only way to provide all language in each subsection full effect.

The district court also drew on section 3624(g)(1)(A)'s definition of "eligible prisoners" as someone who "has earned time credits under [the FSA] in an amount that is equal to the remainder of the prisoner's imposed term of imprisonment." (ER-6) This definition, explained the court, suggested that "time

---

on such a statistically small group of criminal defendants. *United States v. Trident Seafoods Corp.*, 92 F.3d 855, 862 (9th Cir. 1996).

[5] If anything, Congress's decision to impose a cap of credits to reduce imprisonment favors Gonzalez's reading. Congress was fully capable of limiting the amount of credits applicable to reduce time in supervised release, but did not do so. "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Toor v. Lynch*, 789 F.3d 1055, 1062 (9th Cir. 2015) (quotation omitted).

24

credits are applicable to reduce a prison term only." (*Id.*) However, that one's prison time calculation defines one's eligibility for transfer does nothing to change section 3632(d)(4)(C)'s plain textual imperative that ETCs "shall be applied toward time in…supervised release." Again, one's obtaining a transfer as an "eligible prisoner[]" under section 3624(g)(1)(A) is not preclusive of *also* using one's ETCs by applying them toward satisfaction of a supervised-release term under section 3632(d)(4)(C).

The broader statutory context does nothing to diminish Gonzalez's clear entitlement to use his ETCs.

> ### 3. *Gonzalez's reading of section 3632 best aligns with the FSA's legislative history.*

Because the plain statutory language lacks any ambiguity, the Court need not consider arguments regarding the FSA's legislative history. *See, e.g.*, *Flores*, 735 F.3d at 860 (legislative history is relevant only as "an aid to the interpretation of ambiguous text"). Still, all relevant sources support Gonzalez's interpretation of the FSA.

The FSA was a significant "reform measure" designed to reduce recidivism and address overly punitive sentencing. 164 Cong. Rec. H10346-04, H10360, 2018 WL 6710302 (Dec. 20, 2018) (statement of Rep. Bob Goodlatte). It was enacted by a "historic bipartisan coalition…[that] came together to bring greater fairness and justice to the Nation's criminal justice system." Br. of Sens. Durbin, Grassley,

25

Booker, and Lee as Amici Curiae at 2, *Terry v. United States*, No. 20-5904, 141 S. Ct. 1858 (2021). Congress recognized the failures of "the 'tough-on-crime' prison and sentencing laws of the 1980s and 1990s," and that the system's emphasis on punishment, instead of programs designed to reduce recidivism, was "counterproductive." *United States v. Simons*, 375 F. Supp. 3d 379, 384–85 (E.D.N.Y. 2019) A broad consensus of legislators agreed that "nonviolent, lowrisk offenders and their families" were deserving of "greater hope for a brighter future" and thus sought to eliminate or moderate the effects of their sentences. 164 Cong. Rec. S7745-01, S7752, 2018 WL 6624756 (Dec. 18, 2018) (statements of Sen. Robert Menendez).

As this history illustrates, no statutory analysis of a provision of the FSA is complete without attending to the FSA's irrefutable purpose as "a remedial statute." *See United States v. Wirsing*, 943 F.3d 175, 176 (4th Cir. 2019); *see also United States v. White*, 984 F.3d 76, 89–90 (D.C. Cir. 2020) (First Step Act is "strong remedial statute[]" and must be interpreted accordingly).

One of several manifestations of that purpose is the ETC framework at issue here. That framework provides for prisoners to, through the completion of "recidivism reduction programming or productive activities," "earn time credits" toward what is elsewhere described as their "sentence." 18 U.S.C. § 3632(d)(4)(A), (D). As the statute reflects through its references to "prerelease custody" and

26

"supervised release" interchangeably with references to the "sentence," and as Congress knows, a "sentence" includes any supervised release term. *United States v. Haymond*, 588 U.S. 634, 648(2019) (plurality op.).

But Congress did not leave this question to chance. It knew about this distinction and sought to clarify that credits were to be applied toward time in supervised release. While the first "[h]ouse-passed FIRST STEP Act limited the use of earned credits to time in prerelease custody[,]" the bill was revised to "expand the use of earned credits to supervised release." 164 Cong. Rec. H10396-02, H10399, 2018 WL 6710307 (statement of Rep. Sheila Jackson Lee). Thus, in implementing the FSA, Congress expected, and implemented, a system where FSA ETCs could be applied toward "time in" supervised release in addition to prerelease custody, and it did so to honor a clear preference for incentivizing recidivism-reducing programs for individuals such as Gonzalez (a low-risk drug offender convicted of a nonviolent offense).

        4.    *The government's policy arguments are meritless.*

The government acknowledged the importance of these incentives before the district court (ER-101 (FSA's purpose was "motivat[ing]…prisoners to participate" in recidivism-reduction programming)), but argued, without elaboration, that the only way to encourage participation in programs was to

27

"promis[e] an earlier conclusion of [a defendant's] criminal sentence"—and nothing more. (*Id.*)[6]

The district court, perhaps recognizing this as a veiled and misguided policy argument, did not engage with the government's point. If pursued again on appeal, this Court should do the same. It is, of course, not this Court's prerogative to rewrite the FSA consistent with what it considers the best sentencing policy. *Cf. Concepcion v. United States*, 597 U.S. 481, 506 (2022) (Kavanaugh, J., dissenting) ("Perhaps the Court's decision represents better sentencing policy. Perhaps not. But under the Constitution's separation of powers, this Court may not simply rewrite the First Step Act as the Court thinks best."). This Court has recognized as much, turning away appeals to policy arguments where the FSA's text and purpose is as clear as it is here. *See Lopez*, 998 F.3d at 444 (this Court will not "ignore Congress's plain and unambiguous language just because a statute might reach further than some in Congress expected").

But even entertaining the argument, an "earlier conclusion of [a] criminal sentence" is an undoubtedly significant incentive, and Gonzalez is not arguing otherwise. The relevant question is whether the FSA can, and in fact does, do more

---

[6] Because a "criminal sentence" includes a term of supervised release, *see, e.g.*, 18 U.S.C. § 3583(a), Gonzalez assumes that the government meant the conclusion of a custodial sentence only.

than that to "motivat[e]" additional participation. It goes without saying that a more expansive application of ETC provisions to the time served in custody (*i.e.*, resulting in an "earlier conclusion" of a criminal sentence) *and* to time served in supervised release would only serve to "motivat[e]" *more* participation in recidivism-reduction programming.

This basic understanding of an incentive system should be non-controversial. But to dispel any potential controversy, consider the following illustrative example Gonzalez cited in his briefing below. (ER-24) Think of your average 10-year-old. Suppose you explain to them, "for every hour of chores you do per week, you earn one credit, up to a maximum of 10 credits, and you can apply those 10 credits 'toward' a five-credit toy gun or a five-credit basketball." Days later, the 10-year-old returns having completed their 10 hours of chores, and asks to apply the 10 credits to the five-credit toy gun *and* the five-credit basketball. Tough luck for your 10-year-old, according to the BOP. At best, the 10-year-old can choose between the toy gun and the basketball, but cannot apply his hard-earned credits toward both. Under this scheme, would anyone reasonably expect their 10-year-old to do 10 hours of chores the next week? The answer is surely "no," as there is, at most, incentive to do only five hours of chores.

Like that 10-year-old, Gonzalez, as well as countless lay incarcerated individuals similarly situated to him, reasonably expected to use *all* of the credits

29

they earned, whether applied toward time in prerelease custody or supervised release, by completing required programming and activities. *See, e.g., United States v. Begay*, 33 F.4th 1081, 1095 (9th Cir. 2022) (en banc) (statutory interpretation requires that court "not lose sight of…common sense"). But one can easily expect a sharp decrease in participation in those programs and activities if the BOP continues to decline to hold up their end of the bargain by providing the "incentives" that Section 3632(d)'s plain language requires, consistent with the FSA's history and broader purposes.

However, as the BOP did not contest below, it is not effectuating time calculations and transfers in a timely manner, nor responding to individuals, such as Gonzalez, seeking timely application of their credits. (ER-22, 32–35, 136–38) Under these circumstances, the ETCs of countless individuals similarly situated to Gonzalez will regularly go unused,[7] in contravention of section 3632(d)(4)(C)'s mandatory language, as well as the FSA's promise as a transformative measure for the federal criminal justice system.

---

[7] Timely application of ETCs is necessary in part because ETCs cannot be applied to place someone in prerelease custody until their ETCs equal the amount of time left to serve on a sentence. *See* 18 U.S.C. § 3624(g)(1)(A); 28 C.F.R. § 523.44(b)(1). Then, as previously noted, only one year of ETCs may be applied to reduce up to one year of incarceration. 18 U.S.C. § 3624(g)(3).

> 5. *Gonzalez's position is consistent with the ends of federal sentencing.*

The government also argued, citing *United States v. Johnson*, 529 U.S. 53 (2000), that Gonzalez's reading of the FSA contradicts the broader ends of federal sentencing. (ER-101–02)

The Court in *Johnson* did generically explain that "[s]upervised release fulfills rehabilitative ends[] distinct from those served by incarceration." 529 U.S. at 59. *Johnson*, of course, pre-dates the FSA, and naturally does not define how FSA credits are to be applied. *See Dyer*, 2022 WL 1598249, at *3 (rejecting application of *Johnson* to this provision for these reasons). Furthermore, *Johnson*'s actual explanation of the purposes of supervised release are consonant with Gonzalez's arguments here. *Johnson* stated that "the primary goal [of supervised release] is to ease the defendant's transition into the community after the service of a long prison term for a particularly serious offense, or to provide rehabilitation to a defendant who has spent a fairly short period in prison." *Id.* That is why "Congress intended supervised release to assist individuals in their transition to community life." *Id.*

Reading the FSA's ETC provisions to permit credits toward supervised release accomplishes that same end by providing incentives for the maximum possible participation in recidivism-reduction programming, thus enhancing rehabilitation. The government's reading, by contrast, incentivizes incarcerated

31

individuals to at most complete programming for 12 months' credits, because that is all section 3624(g)(3) permits for transfers to supervised release. Therefore, Gonzalez's reading is unquestionably most consistent with the ends of sentencing, too.

### 6. *This issue has divided district courts, but those opinions adopting Gonzalez's reading are more persuasive.*

While this Court has not yet addressed the question presented by this appeal, several district courts have, producing divergent opinions. In *Dyer*, for example, the district court found section 3632(d)(4)(C)'s "unambiguous, mandatory language" required application of ETCs toward time in supervised release. 2022 WL 1598249, at *3. The *Dyer* court thus concluded it was unnecessary to conduct further statutory analysis, other than to reject the government's argument based on *Johnson*—the same one it makes here. *Id.* Several courts have since aligned themselves with *Dyer* and Gonzalez's reading of the FSA.[8]

---

[8] *See, e.g.*, *Lallave v. Martinez*, No. 22-CV-4136, 2022 WL 7578794 (E.D.N.Y. Oct. 13, 2022) (ordering the BOP to calculate petitioner's ETCs and apply the remaining credits to reduce her time on supervised release); *Cook v. Hemingway*, No. 21-CV-11711, 2022 WL 3568571, at *4 (E.D. Mich. Aug. 18, 2022) (dismissing the petition without prejudice to the petitioner "seeking the application of any earned time credit following proper exhaustion, including its application to his period of supervised release" (citing *Dyer*)); *United States v. Smith*, No. 1:17-cr-20753, 2022 WL 17718413, at *4 (E.D. Mich. Dec. 15, 2022) ("Defendant's FSA Time Credits should be applied to his time on supervised release if he is not approved for prerelease custody before his term of imprisonment ends."); *Russo v. Caravajel*, No. CR 20-47, 2022 WL 16749036, at

The government cited two contrary cases below. (ER-99 (citing *Ector v. Engleman*, No. 22-cv-6044-FLA (JPR), 2023 WL 6969784 (C.D. Cal. July 28, 2023), *report and recommendation adopted*, No. 2:22-CV-06044-FLA-JPR, 2023 WL 6130511, at *5 (C.D. Cal. Sept. 18, 2023); *United States v. Calhoun*, No. 3:08-CR-77-DPJ-LGI, 2023 WL 7930053, at *2 (S.D. Miss. Nov. 16, 2023)). These cases—and virtually all other cases rejecting Gonzalez's reading—are traceable to *United States v. Calabrese*, No. 11-cr-437, 2023 WL 1969753, at *2–3 (N.D. Ohio Feb. 13, 2023). These matters have mostly involved uncounseled defendants with less developed arguments on this issue, and generally adhere to *Calabrese* with little else to add to the discussion. *See Calhoun*, 2023 WL 7930053, at *2 (surveying cases while observing that most courts have just followed *Calabrese*).

---

*3 (E.D. Pa. Nov. 7, 2022) (after petitioner exhausts remedies, he "will still have the opportunity to apply any earned time credits he may receive under the FSA to his 36-month term of supervised release" (citing 18 U.S.C. § 3632(d)(4)(C))); *Yanagihara v. Derr*, No. CV 22-00145 JAO-RT, 2023 WL 2163685, at *4 (D. Haw. Feb. 22, 2023) (because it is "possible for [the petitioner] to receive relief in the form of a reduced or modified term of supervised release, this case is not rendered moot" (quotation omitted)); *Gratton v. Dismas Charities, Inc.*, No. 3:20-00509, 2021 WL 4163992, at *5 & n.11 (M.D. Tenn. Aug. 20, 2021), *report and recommendation adopted*, No. 3:20-CV-00509, 2021 WL 4149126 (M.D. Tenn. Sept. 13, 2021) ("By its own terms, the First Step Act provides that FTC accrued under Section 3632(d)(4)(A) may be applied to a term of supervised release."); *Randolph v. Hudson*, No. 22-3049-JWL, 2022 WL 1909051, at *2 (D. Kan. June 3, 2022) (similar (citing *Gratton*)); *Cohen v. United States*, No. 20-CV-10833 (JGK), 2021 WL 1549917, at *4 (S.D.N.Y. Apr. 20, 2021) ("ETCs can be applied toward time on supervised release[.]").

33

The district court here more or less approached the issue the same way, finding the "statutory analysis" in *Calabrese*, and another case, *Harrison v. Fed. Bureau of Prisons*, No. 22-14312-Scola, 2022 WL 17093441 (S.D. Fla. Nov. 21, 2022), "most persuasive." (ER-6) However, as Gonzalez explained, *Calabrese* was flawed in several ways the district court declined to explore. (ER-27) *Calabrese* did not confront the argument that its reading of section 3632(d)(4)(C) would render "time in" superfluous. *See supra* Part VII.B.1. It simply read "toward" as "bring[ing]…something closer to happening" without accounting for the relationship of the word to "time in." *See Calabrese*, No. 11-cr-437, 2023 WL 1969753, at \*2–3. *Calabrese* also made the same contextual arguments discussed above, but those arguments are equally misguided. *See supra* Part VII.B.2.[9]

While this Court is not bound by these decisions, it can and should adopt the position, as reflected in *Dyer* and other like cases, that is most consistent with the FSA's text and purpose, and hold that Gonzalez's ETCs "shall be applied toward [his] time in…supervised release[.]" 18 U.S.C. § 3632(d)(4)(C).

---

[9] *Harrison*, too, involved a conclusory textual analysis, with one line dedicated to the court's conclusion that the "plain text" only permits ETCs to be "used to allow early transfer to supervised release." 2022 WL 17093441, at \*1. The court then completed its analysis by summarily rejecting *Dyer* as "non-binding[,]" before making the same flawed point regarding *Johnson* discussed above. *Harrison*, 2022 WL 17093441, at \*1–2.

>    7.    *Any ambiguity should be resolved in favor of Gonzalez*
>          *under the rule of lenity.*

If this Court still questions the FSA's coverage here, it should conclude that the text is ambiguous and apply the rule of lenity to resolve any ambiguity favorably to Gonzalez. *United States v. Granderson*, 511 U.S. 39, 54 (1994). Under the rule of lenity, "ambiguities about the breadth of a criminal statute should be resolved in the defendant's favor." *United States v. Davis*, 588 U.S. 445, 464 (2019). Lenity applies both to "the substantive ambit of criminal prohibitions" and "the penalties they impose." *Bifulco v. United States*, 447 U.S. 381, 387 (1980). ETCs have this effect. *See Davis v. Crabtree*, 109 F.3d 566, 568, 570 (9th Cir. 1997) (rule of lenity applicable to provision for reduction of time in custody after completing a treatment program).

>    8.    *The district court's reference to the BOP's own regulations*
>          *does not justify a different result.*

The BOP's "implementing regulations"—referenced by the district court in a one-sentence footnote as "supportive" of its interpretation of the statute—do not supply a basis for construing the FSA to prevent application of Gonzalez's ETCs. (ER-6) These regulations recognize the BOP's authority to transfer eligible individuals to prerelease custody or supervised release. 28 C.F.R. §§ 523.40(b) (providing that eligible inmates "may earn FSA Time Credits to be applied toward prerelease custody or early transfer to supervised release"), 523.44(d) (defining

35

conditions for "transfer to supervised release"). But, as explained above, transfer does not preclude credit, and vice versa. Rather, the two work hand-in-hand. The regulations are silent as to section 3632(d)(4)(C)'s plain requirements, not to mention the concept of applying credits toward time in post-release supervision.

The district court did not suggest it was affording regulatory deference to these provisions. Nor did the government urge deference in its briefing. But to the extent the government changes course here, no deference is warranted.

Indeed, "alarm bells should be going off" in such circumstances. *United States v. Havis*, 907 F.3d 439, 450 (6th Cir. 2018) (Thapar, J., concurring), *vacated*, 921 F.3d 628 (6th Cir. 2019). Administrative deference in the criminal context is especially dubious, running up against the principle that "criminal laws are for courts, not for the Government, to construe." *Abramski v. United States*, 573 U.S. 169, 191 (2014). This type of deference "turn[s] the normal construction of criminal statutes upside-down, replacing the doctrine of lenity with a doctrine of severity." *Crandon v. United States*, 494 U.S. 152, 177–78 (1990) (Scalia, J., concurring). Consequently, "when liberty is at stake[,]" deference "has no role to play[.]" *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 140 S. Ct. 789, 790 (2020) (Gorsuch, J., statement regarding denial of certiorari). This Court thus "do[es] not defer to an agency's interpretations of state law or provisions of

36

the federal criminal code." *Sandoval v. Sessions*, 866 F.3d 986, 988 (9th Cir. 2017).

This regulation is a particularly ill-suited candidate for deference because it is not a reasonable interpretation of the statutory and regulatory scheme. *Kisor v. Wilkie*, 588 U.S. 558, 575 (2019) (for deference under *Auer v. Robbins*, 519 U.S. 452, 461 (1997) to apply, text must be ambiguous, and the agency must reasonably interpret that ambiguity); *see Neal v. U.S. Penitentiary Atwater*, 585 F. App'x 730, 730 (9th Cir. 2014) (unpublished) (BOP's interpretation of its own regulation analyzed under *Auer*). As explained *supra*, the rule contradicts the statute, disregarding the text of section 3632(d)(4)(C), as well as the purpose of the statutory scheme.

Therefore, no deference is warranted. *Gunderson v. Hood*, 268 F.3d 1149, 1154 (9th Cir. 2001). Congress has spoken directly on this question, and "'that is the end of the matter[.]'" *Sacora v. Thomas*, 628 F.3d 1059, 1066 (9th Cir. 2010) (quotation omitted). Through the First Step Act, Congress took a varied approach to agency discretion. Some places, it took a permissive approach, as signified by the word "may." 18 U.S.C. § 3624(g)(3). But regarding time credits toward time in supervised release, it used mandatory language—"Time credits earned under this paragraph by prisoners who successfully participate in recidivism reduction programs or productive activities *shall be applied* toward time in prerelease

37

custody or supervised release."—precisely to occupy this space. 18 U.S.C. § 3632(d)(4)(C) (emphasis added); *see United States v. Kowalczyk*, 805 F.3d 847, 857 (9th Cir. 2015) ("shall" is "language of command"); *Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quotation omitted)). Moreover, any ambiguity must be resolved with the FSA's recidivism-reducing goals in mind. *See supra* Part VII.B.3.

For these reasons, the BOP's regulations are no barrier to the relief that Gonzalez seeks.

\* \* \*

The First Step Act was a landmark reform designed to stem the effects of mass incarceration and promote rehabilitation through anti-recidivism measures such as earned-time credit programs. Regarding those earned-time credit programs, Congress provided a clear mandate to effectuate those goals: earned-time credits "shall be applied toward time in . . . supervised release." 18 U.S.C. § 3632(d)(4)(C). The district court's conclusion that Gonzalez could not apply his ETCs to reduce his "[t]ime [i]n" supervised release runs counter to the FSA's clear text and congressional intent. This Court should recognize as much and reverse.

## VIII. CONCLUSION

For the foregoing reasons, this Court should reverse the order denying Gonzalez's petition, and remand with direction to apply Gonzalez's earned-time credits to the remainder of his term of supervised release.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: July 29, 2024                By  */s/ Hunter Haney*
                                    HUNTER HANEY
                                    Deputy Federal Public Defender
                                    Attorney for Petitioner-Appellant

39

# INDEX OF ADDENDUM

18 U.S.C. § 3624 Release of a prisoner ............................................................. A1

18 U.S.C. § 3632 Development of risk and needs assessment system............. A8

28 C.F.R. § 523.40 Purpose .............................................................................. A19

28 C.F.R. § 523.44 Application of FSA Time Credits ...................................... A20

40

United States Code Annotated
  Title 18. Crimes and Criminal Procedure (Refs & Annos)
    Part II. Criminal Procedure
      Chapter 229. Postsentence Administration (Refs & Annos)
        Subchapter C. Imprisonment

18 U.S.C.A. § 3624

§ 3624. Release of a prisoner

Effective: July 19, 2019

Currentness

**(a) Date of release.**--A prisoner shall be released by the Bureau of Prisons on the date of the expiration of the prisoner's term of imprisonment, less any time credited toward the service of the prisoner's sentence as provided in subsection (b). If the date for a prisoner's release falls on a Saturday, a Sunday, or a legal holiday at the place of confinement, the prisoner may be released by the Bureau on the last preceding weekday.

**(b) Credit toward service of sentence for satisfactory behavior.**--

**(1)** Subject to paragraph (2), a prisoner who is serving a term of imprisonment of more than 1 year [1] other than a term of imprisonment for the duration of the prisoner's life, may receive credit toward the service of the prisoner's sentence, of up to 54 days for each year of the prisoner's sentence imposed by the court, subject to determination by the Bureau of Prisons that, during that year, the prisoner has displayed exemplary compliance with institutional disciplinary regulations. Subject to paragraph (2), if the Bureau determines that, during that year, the prisoner has not satisfactorily complied with such institutional regulations, the prisoner shall receive no such credit toward service of the prisoner's sentence or shall receive such lesser credit as the Bureau determines to be appropriate. In awarding credit under this section, the Bureau shall consider whether the prisoner, during the relevant period, has earned, or is making satisfactory progress toward earning, a high school diploma or an equivalent degree. Credit that has not been earned may not later be granted. Subject to paragraph (2), credit for the last year of a term of imprisonment shall be credited on the first day of the last year of the term of imprisonment.

**(2)** Notwithstanding any other law, credit awarded under this subsection after the date of enactment of the Prison Litigation Reform Act shall vest on the date the prisoner is released from custody.

**(3)** The Attorney General shall ensure that the Bureau of Prisons has in effect an optional General Educational Development program for inmates who have not earned a high school diploma or its equivalent.

**(4)** Exemptions to the General Educational Development requirement may be made as deemed appropriate by the Director of the Federal Bureau of Prisons.

**(c) Prerelease custody.**--

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**(1) In general.**--The Director of the Bureau of Prisons shall, to the extent practicable, ensure that a prisoner serving a term of imprisonment spends a portion of the final months of that term (not to exceed 12 months), under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community. Such conditions may include a community correctional facility.

**(2) Home confinement authority.**--The authority under this subsection may be used to place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months. The Bureau of Prisons shall, to the extent practicable, place prisoners with lower risk levels and lower needs on home confinement for the maximum amount of time permitted under this paragraph.

**(3) Assistance.**--The United States Probation System shall, to the extent practicable, offer assistance to a prisoner during prerelease custody under this subsection.

**(4) No limitations.**--Nothing in this subsection shall be construed to limit or restrict the authority of the Director of the Bureau of Prisons under section 3621.

**(5) Reporting.**--Not later than 1 year after the date of the enactment of the Second Chance Act of 2007 (and every year thereafter), the Director of the Bureau of Prisons shall transmit to the Committee on the Judiciary of the Senate and the Committee on the Judiciary of the House of Representatives a report describing the Bureau's utilization of community corrections facilities. Each report under this paragraph shall set forth the number and percentage of Federal prisoners placed in community corrections facilities during the preceding year, the average length of such placements, trends in such utilization, the reasons some prisoners are not placed in community corrections facilities, and number of prisoners not being placed in community corrections facilities for each reason set forth, and any other information that may be useful to the committees in determining if the Bureau is utilizing community corrections facilities in an effective manner.

**(6) Issuance of regulations.**--The Director of the Bureau of Prisons shall issue regulations pursuant to this subsection not later than 90 days after the date of the enactment of the Second Chance Reauthorization Act of 2018, which shall ensure that placement in a community correctional facility by the Bureau of Prisons is--

  **(A)** conducted in a manner consistent with section 3621(b) of this title;

  **(B)** determined on an individual basis; and

  **(C)** of sufficient duration to provide the greatest likelihood of successful reintegration into the community.

**(d) Allotment of clothing, funds, and transportation.**--Upon the release of a prisoner on the expiration of the prisoner's term of imprisonment, the Bureau of Prisons shall furnish the prisoner with--

  **(1)** suitable clothing;

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**(2)** an amount of money, not more than $500, determined by the Director to be consistent with the needs of the offender and the public interest, unless the Director determines that the financial position of the offender is such that no sum should be furnished; and

**(3)** transportation to the place of the prisoner's conviction, to the prisoner's bona fide residence within the United States, or to such other place within the United States as may be authorized by the Director.

**(e) Supervision after release.**--A prisoner whose sentence includes a term of supervised release after imprisonment shall be released by the Bureau of Prisons to the supervision of a probation officer who shall, during the term imposed, supervise the person released to the degree warranted by the conditions specified by the sentencing court. The term of supervised release commences on the day the person is released from imprisonment and runs concurrently with any Federal, State, or local term of probation or supervised release or parole for another offense to which the person is subject or becomes subject during the term of supervised release. A term of supervised release does not run during any period in which the person is imprisoned in connection with a conviction for a Federal, State, or local crime unless the imprisonment is for a period of less than 30 consecutive days. Upon the release of a prisoner by the Bureau of Prisons to supervised release, the Bureau of Prisons shall notify such prisoner, verbally and in writing, of the requirement that the prisoner adhere to an installment schedule, not to exceed 2 years except in special circumstances, to pay for any fine imposed for the offense committed by such prisoner, and of the consequences of failure to pay such fines under sections 3611 through 3614 of this title.

**(f) Mandatory functional literacy requirement.--**

**(1)** The Attorney General shall direct the Bureau of Prisons to have in effect a mandatory functional literacy program for all mentally capable inmates who are not functionally literate in each Federal correctional institution within 6 months from the date of the enactment of this Act.

**(2)** Each mandatory functional literacy program shall include a requirement that each inmate participate in such program for a mandatory period sufficient to provide the inmate with an adequate opportunity to achieve functional literacy, and appropriate incentives which lead to successful completion of such programs shall be developed and implemented.

**(3)** As used in this section, the term "functional literacy" means--

**(A)** an eighth grade equivalence in reading and mathematics on a nationally recognized standardized test;

**(B)** functional competency or literacy on a nationally recognized criterion-referenced test; or

**(C)** a combination of subparagraphs (A) and (B).

**(4)** Non-English speaking inmates shall be required to participate in an English-As-A-Second-Language program until they function at the equivalence of the eighth grade on a nationally recognized educational achievement test.

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

A3  3

**(5)** The Chief Executive Officer of each institution shall have authority to grant waivers for good cause as determined and documented on an individual basis.

**(g) Prerelease custody or supervised release for risk and needs assessment system participants.**--

**(1) Eligible prisoners.**--This subsection applies in the case of a prisoner (as such term is defined in section 3635) who--

**(A)** has earned time credits under the risk and needs assessment system developed under subchapter D (referred to in this subsection as the "System") in an amount that is equal to the remainder of the prisoner's imposed term of imprisonment;

**(B)** has shown through the periodic risk reassessments a demonstrated recidivism risk reduction or has maintained a minimum or low recidivism risk, during the prisoner's term of imprisonment;

**(C)** has had the remainder of the prisoner's imposed term of imprisonment computed under applicable law; and

**(D)(i)** in the case of a prisoner being placed in prerelease custody, the prisoner--

**(I)** has been determined under the System to be a minimum or low risk to recidivate pursuant to the last 2 reassessments of the prisoner; or

**(II)** has had a petition to be transferred to prerelease custody or supervised release approved by the warden of the prison, after the warden's determination that--

**(aa)** the prisoner would not be a danger to society if transferred to prerelease custody or supervised release;

**(bb)** the prisoner has made a good faith effort to lower their recidivism risk through participation in recidivism reduction programs or productive activities; and

**(cc)** the prisoner is unlikely to recidivate; or

**(ii)** in the case of a prisoner being placed in supervised release, the prisoner has been determined under the System to be a minimum or low risk to recidivate pursuant to the last reassessment of the prisoner.

**(2) Types of prerelease custody.**--A prisoner shall be placed in prerelease custody as follows:

**(A) Home confinement.**--

**(i) In general.**--A prisoner placed in prerelease custody pursuant to this subsection who is placed in home confinement shall--

**(I)** be subject to 24-hour electronic monitoring that enables the prompt identification of the prisoner, location, and time, in the case of any violation of subclause (II);

**(II)** remain in the prisoner's residence, except that the prisoner may leave the prisoner's home in order to, subject to the approval of the Director of the Bureau of Prisons--

**(aa)** perform a job or job-related activities, including an apprenticeship, or participate in job-seeking activities;

**(bb)** participate in evidence-based recidivism reduction programming or productive activities assigned by the System, or similar activities;

**(cc)** perform community service;

**(dd)** participate in crime victim restoration activities;

**(ee)** receive medical treatment;

**(ff)** attend religious activities; or

**(gg)** participate in other family-related activities that facilitate the prisoner's successful reentry such as a family funeral, a family wedding, or to visit a family member who is seriously ill; and

**(III)** comply with such other conditions as the Director determines appropriate.

**(ii) Alternate means of monitoring.**--If the electronic monitoring of a prisoner described in clause (i)(I) is infeasible for technical or religious reasons, the Director of the Bureau of Prisons may use alternative means of monitoring a prisoner placed in home confinement that the Director determines are as effective or more effective than the electronic monitoring described in clause (i)(I).

**(iii) Modifications.**--The Director of the Bureau of Prisons may modify the conditions described in clause (i) if the Director determines that a compelling reason exists to do so, and that the prisoner has demonstrated exemplary compliance with such conditions.

**(iv) Duration.**--Except as provided in paragraph (4), a prisoner who is placed in home confinement shall remain in home confinement until the prisoner has served not less than 85 percent of the prisoner's imposed term of imprisonment.

**(B) Residential reentry center.**--A prisoner placed in prerelease custody pursuant to this subsection who is placed at a residential reentry center shall be subject to such conditions as the Director of the Bureau of Prisons determines appropriate.

**(3) Supervised release.**--If the sentencing court included as a part of the prisoner's sentence a requirement that the prisoner be placed on a term of supervised release after imprisonment pursuant to section 3583, the Director of the Bureau of Prisons may transfer the prisoner to begin any such term of supervised release at an earlier date, not to exceed 12 months, based on the application of time credits under section 3632.

**(4) Determination of conditions.**--In determining appropriate conditions for prisoners placed in prerelease custody pursuant to this subsection, the Director of the Bureau of Prisons shall, to the extent practicable, provide that increasingly less restrictive conditions shall be imposed on prisoners who demonstrate continued compliance with the conditions of such prerelease custody, so as to most effectively prepare such prisoners for reentry.

**(5) Violations of conditions.**--If a prisoner violates a condition of the prisoner's prerelease custody, the Director of the Bureau of Prisons may impose such additional conditions on the prisoner's prerelease custody as the Director of the Bureau of Prisons determines appropriate, or revoke the prisoner's prerelease custody and require the prisoner to serve the remainder of the term of imprisonment to which the prisoner was sentenced, or any portion thereof, in prison. If the violation is nontechnical in nature, the Director of the Bureau of Prisons shall revoke the prisoner's prerelease custody.

**(6) Issuance of guidelines.**--The Attorney General, in consultation with the Assistant Director for the Office of Probation and Pretrial Services, shall issue guidelines for use by the Bureau of Prisons in determining--

**(A)** the appropriate type of prerelease custody or supervised release and level of supervision for a prisoner placed on prerelease custody pursuant to this subsection; and

**(B)** consequences for a violation of a condition of such prerelease custody by such a prisoner, including a return to prison and a reassessment of evidence-based recidivism risk level under the System.

**(7) Agreements with United States Probation and Pretrial Services.**--The Director of the Bureau of Prisons shall, to the greatest extent practicable, enter into agreements with United States Probation and Pretrial Services to supervise prisoners placed in home confinement under this subsection. Such agreements shall--

**(A)** authorize United States Probation and Pretrial Services to exercise the authority granted to the Director pursuant to paragraphs (3) and (4); and

**(B)** take into account the resource requirements of United States Probation and Pretrial Services as a result of the transfer of Bureau of Prisons prisoners to prerelease custody or supervised release.

**(8) Assistance.**--United States Probation and Pretrial Services shall, to the greatest extent practicable, offer assistance to any prisoner not under its supervision during prerelease custody under this subsection.

**(9) Mentoring, reentry, and spiritual services.**--Any prerelease custody into which a prisoner is placed under this subsection may not include a condition prohibiting the prisoner from receiving mentoring, reentry, or spiritual services from a person who provided such services to the prisoner while the prisoner was incarcerated, except that the warden of the facility at which the prisoner was incarcerated may waive the requirement under this paragraph if the warden finds that the provision of such services would pose a significant security risk to the prisoner, persons who provide such services, or any other person. The warden shall provide written notice of any such waiver to the person providing such services and to the prisoner.

**(10) Time limits inapplicable.**--The time limits under subsections (b) and (c) shall not apply to prerelease custody under this subsection.

**(11) Prerelease custody capacity.**--The Director of the Bureau of Prisons shall ensure there is sufficient prerelease custody capacity to accommodate all eligible prisoners.

### CREDIT(S)

(Added Pub.L. 98-473, Title II, § 212(a)(2), Oct. 12, 1984, 98 Stat. 2008; amended Pub.L. 99-646, §§ 16(a), 17(a), Nov. 10, 1986, 100 Stat. 3595; Pub.L. 101-647, Title XXIX, §§ 2902(a), 2904, Nov. 29, 1990, 104 Stat. 4913; Pub.L. 103-322, Title II, §§ 20405, 20412, Sept. 13, 1994, 108 Stat. 1825, 1828; Pub.L. 104-66, Title I, § 1091(c), Dec. 21, 1995, 109 Stat. 722; Pub.L. 104-134, Title I, § 101[(a)][Title VIII, § 809(c)], Apr. 26, 1996, 110 Stat.1321-76; renumbered Title I, Pub.L. 104-140, § 1(a), May 2, 1996, 110 Stat. 1327; Pub.L. 110-177, Title V, § 505, Jan. 7, 2008, 121 Stat. 2542; Pub.L. 110-199, Title II, § 251(a), Apr. 9, 2008, 122 Stat. 692; Pub.L. 115-391, Title I, § 102(b)(1), Title V, § 504(c), Title VI, § 602, Dec. 21, 2018, 132 Stat. 5210, 5233, 5238.)

### Footnotes

1      So in original. Probably should be followed by a comma.

18 U.S.C.A. § 3624, 18 USCA § 3624
Current through P.L. 118-70. Some statute sections may be more current, see credits for details.

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 18. Crimes and Criminal Procedure (Refs & Annos)
    Part II. Criminal Procedure
      Chapter 229. Postsentence Administration (Refs & Annos)
        Subchapter D. Risk and Needs Assessment System

18 U.S.C.A. § 3632

§ 3632. Development of risk and needs assessment system

Effective: December 21, 2018

Currentness

**(a) In general.**--Not later than 210 days after the date of enactment of this subchapter, the Attorney General, in consultation with the Independent Review Committee authorized by the First Step Act of 2018, shall develop and release publicly on the Department of Justice website a risk and needs assessment system (referred to in this subchapter as the "System"), which shall be used to--

  **(1)** determine the recidivism risk of each prisoner as part of the intake process, and classify each prisoner as having minimum, low, medium, or high risk for recidivism;

  **(2)** assess and determine, to the extent practicable, the risk of violent or serious misconduct of each prisoner;

  **(3)** determine the type and amount of evidence-based recidivism reduction programming that is appropriate for each prisoner and assign each prisoner to such programming accordingly, and based on the prisoner's specific criminogenic needs, and in accordance with subsection (b);

  **(4)** reassess the recidivism risk of each prisoner periodically, based on factors including indicators of progress, and of regression, that are dynamic and that can reasonably be expected to change while in prison;

  **(5)** reassign the prisoner to appropriate evidence-based recidivism reduction programs or productive activities based on the revised determination to ensure that--

    **(A)** all prisoners at each risk level have a meaningful opportunity to reduce their classification during the period of incarceration;

    **(B)** to address [1] the specific criminogenic needs of the prisoner; and

    **(C)** all prisoners are able to successfully participate in such programs;

**(6)** determine when to provide incentives and rewards for successful participation in evidence-based recidivism reduction programs or productive activities in accordance with subsection (e);

**(7)** determine when a prisoner is ready to transfer into prerelease custody or supervised release in accordance with section 3624; and

**(8)** determine the appropriate use of audio technology for program course materials with an understanding of dyslexia.

In carrying out this subsection, the Attorney General may use existing risk and needs assessment tools, as appropriate.

**(b) Assignment of evidence-based recidivism reduction programs.**--The System shall provide guidance on the type, amount, and intensity of evidence-based recidivism reduction programming and productive activities that shall be assigned for each prisoner, including--

**(1)** programs in which the Bureau of Prisons shall assign the prisoner to participate, according to the prisoner's specific criminogenic needs; and

**(2)** information on the best ways that the Bureau of Prisons can tailor the programs to the specific criminogenic needs of each prisoner so as to most effectively lower each prisoner's risk of recidivism.

**(c) Housing and assignment decisions.**--The System shall provide guidance on program grouping and housing assignment determinations and, after accounting for the safety of each prisoner and other individuals at the prison, provide that prisoners with a similar risk level be grouped together in housing and assignment decisions to the extent practicable.

**(d) Evidence-based recidivism reduction program incentives and productive activities rewards.**--The System shall provide incentives and rewards for prisoners to participate in and complete evidence-based recidivism reduction programs as follows:

**(1) Phone and visitation privileges.**--A prisoner who is successfully participating in an evidence-based recidivism reduction program shall receive--

**(A)** phone privileges, or, if available, video conferencing privileges, for up to 30 minutes per day, and up to 510 minutes per month; and

**(B)** additional time for visitation at the prison, as determined by the warden of the prison.

**(2) Transfer to institution closer to release residence.**--A prisoner who is successfully participating in an evidence-based recidivism reduction program shall be considered by the Bureau of Prisons for placement in a facility closer to the prisoner's release residence upon request from the prisoner and subject to--

**(A)** bed availability at the transfer facility;

**(B)** the prisoner's security designation; and

**(C)** the recommendation from the warden of the prison at which the prisoner is incarcerated at the time of making the request.

**(3) Additional policies.**--The Director of the Bureau of Prisons shall develop additional policies to provide appropriate incentives for successful participation and completion of evidence-based recidivism reduction programming. The incentives shall include not less than 2 of the following:

**(A)** Increased commissary spending limits and product offerings.

**(B)** Extended opportunities to access the email system.

**(C)** Consideration of transfer to preferred housing units (including transfer to different prison facilities).

**(D)** Other incentives solicited from prisoners and determined appropriate by the Director.

**(4) Time credits.**--

**(A) In general.**--A prisoner, except for an ineligible prisoner under subparagraph (D), who successfully completes evidence-based recidivism reduction programming or productive activities, shall earn time credits as follows:

**(i)** A prisoner shall earn 10 days of time credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities.

**(ii)** A prisoner determined by the Bureau of Prisons to be at a minimum or low risk for recidivating, who, over 2 consecutive assessments, has not increased their risk of recidivism, shall earn an additional 5 days of time credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities.

**(B) Availability.**--A prisoner may not earn time credits under this paragraph for an evidence-based recidivism reduction program that the prisoner successfully completed--

**(i)** prior to the date of enactment of this subchapter; or

**(ii)** during official detention prior to the date that the prisoner's sentence commences under section 3585(a).

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**(C) Application of time credits toward prerelease custody or supervised release.**--Time credits earned under this paragraph by prisoners who successfully participate in recidivism reduction programs or productive activities shall be applied toward time in prerelease custody or supervised release. The Director of the Bureau of Prisons shall transfer eligible prisoners, as determined under section 3624(g), into prerelease custody or supervised release.

**(D) Ineligible prisoners.**--A prisoner is ineligible to receive time credits under this paragraph if the prisoner is serving a sentence for a conviction under any of the following provisions of law:

**(i)** Section 32, relating to destruction of aircraft or aircraft facilities.

**(ii)** Section 33, relating to destruction of motor vehicles or motor vehicle facilities.

**(iii)** Section 36, relating to drive-by shootings.

**(iv)** Section 81, relating to arson within special maritime and territorial jurisdiction.

**(v)** Section 111(b), relating to assaulting, resisting, or impeding certain officers or employees using a deadly or dangerous weapon or inflicting bodily injury.

**(vi)** Paragraph (1), (7), or (8) of section 113(a), relating to assault with intent to commit murder, assault resulting in substantial bodily injury to a spouse or intimate partner, a dating partner, or an individual who has not attained the age of 16 years, or assault of a spouse, intimate partner, or dating partner by strangling, suffocating, or attempting to strangle or suffocate.

**(vii)** Section 115, relating to influencing, impeding, or retaliating against a Federal official by injuring a family member, except for a threat made in violation of that section.

**(viii)** Section 116, relating to female genital mutilation.

**(ix)** Section 117, relating to domestic assault by a habitual offender.

**(x)** Any section of chapter 10, relating to biological weapons.

**(xi)** Any section of chapter 11B, relating to chemical weapons.

**(xii)** Section 351, relating to Congressional, Cabinet, and Supreme Court assassination, kidnapping, and assault.

**(xiii)** Section 521, relating to criminal street gangs.

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

A11  4

**(xiv)** Section 751, relating to prisoners in custody of an institution or officer.

**(xv)** Section 793, relating to gathering, transmitting, or losing defense information.

**(xvi)** Section 794, relating to gathering or delivering defense information to aid a foreign government.

**(xvii)** Any section of chapter 39, relating to explosives and other dangerous articles, except for section 836 (relating to the transportation of fireworks into a State prohibiting sale or use).

**(xviii)** Section 842(p), relating to distribution of information relating to explosives, destructive devices, and weapons of mass destruction, but only if the conviction involved a weapon of mass destruction (as defined in section 2332a(c)).

**(xix)** Subsection (f)(3), (h), or (i) of section 844, relating to the use of fire or an explosive.

**(xx)** Section 871, relating to threats against the President and successors to the Presidency.

**(xxi)** Section 879, relating to threats against former Presidents and certain other persons.

**(xxii)** Section 924(c), relating to unlawful possession or use of a firearm during and in relation to any crime of violence or drug trafficking crime.

**(xxiii)** Section 1030(a)(1), relating to fraud and related activity in connection with computers.

**(xxiv)** Section 1091, relating to genocide.

**(xxv)** Any section of chapter 51, relating to homicide, except for section 1112 (relating to manslaughter), 1113 (relating to attempt to commit murder or manslaughter, but only if the conviction was for an attempt to commit manslaughter), 1115 (relating to misconduct or neglect of ship officers), or 1122 (relating to protection against the human immunodeficiency virus).

**(xxvi)** Any section of chapter 55, relating to kidnapping.

**(xxvii)** Any offense under chapter 77, relating to peonage, slavery, and trafficking in persons, except for sections 1593 through 1596.

**(xxviii)** Section 1751, relating to Presidential and Presidential staff assassination, kidnapping, and assault.

**(xxix)** Section 1791, relating to providing or possessing contraband in prison.

**(xxx)** Section 1792, relating to mutiny and riots.

**(xxxi)** Section 1841(a)(2)(C), relating to intentionally killing or attempting to kill an unborn child.

**(xxxii)** Section 1992, relating to terrorist attacks and other violence against railroad carriers and against mass transportation systems on land, on water, or through the air.

**(xxxiii)** Section 2113(e), relating to bank robbery resulting in death.

**(xxxiv)** Section 2118(c), relating to robberies and burglaries involving controlled substances resulting in assault, putting in jeopardy the life of any person by the use of a dangerous weapon or device, or death.

**(xxxv)** Section 2119, relating to taking a motor vehicle (commonly referred to as "carjacking").

**(xxxvi)** Any section of chapter 105, relating to sabotage, except for section 2152.

**(xxxvii)** Any section of chapter 109A, relating to sexual abuse.

**(xxxviii)** Section 2250, relating to failure to register as a sex offender.

**(xxxix)** Section 2251, relating to the sexual exploitation of children.

**(xl)** Section 2251A, relating to the selling or buying of children.

**(xli)** Section 2252, relating to certain activities relating to material involving the sexual exploitation of minors.

**(xlii)** Section 2252A, relating to certain activities involving material constituting or containing child pornography.

**(xliii)** Section 2260, relating to the production of sexually explicit depictions of a minor for importation into the United States.

**(xliv)** Section 2283, relating to the transportation of explosive, biological, chemical, or radioactive or nuclear materials.

**(xlv)** Section 2284, relating to the transportation of terrorists.

**(xlvi)** Section 2291, relating to the destruction of a vessel or maritime facility, but only if the conduct that led to the conviction involved a substantial risk of death or serious bodily injury.

**(xlvii)** Any section of chapter 113B, relating to terrorism.

**(xlviii)** Section 2340A, relating to torture.

**(xlix)** Section 2381, relating to treason.

**(l)** Section 2442, relating to the recruitment or use of child soldiers.

**(li)** An offense described in section 3559(c)(2)(F), for which the offender was sentenced to a term of imprisonment of more than 1 year, if the offender has a previous conviction, for which the offender served a term of imprisonment of more than 1 year, for a Federal or State offense, by whatever designation and wherever committed, consisting of murder (as described in section 1111), voluntary manslaughter (as described in section 1112), assault with intent to commit murder (as described in section 113(a)), aggravated sexual abuse and sexual abuse (as described in sections 2241 and 2242), abusive sexual contact (as described in sections 2244(a)(1) and (a)(2)), kidnapping (as described in chapter 55), carjacking (as described in section 2119), arson (as described in section 844(f)(3), (h), or (i)), or terrorism (as described in chapter 113B).

**(lii)** Section 57(b) of the Atomic Energy Act of 1954 (42 U.S.C. 2077(b)), relating to the engagement or participation in the development or production of special nuclear material.

**(liii)** Section 92 of the Atomic Energy Act of 1954 (42 U.S.C. 2122), relating to prohibitions governing atomic weapons.

**(liv)** Section 101 of the Atomic Energy Act of 1954 (42 U.S.C. 2131), relating to the atomic energy license requirement.

**(lv)** Section 224 or 225 of the Atomic Energy Act of 1954 (42 U.S.C. 2274, 2275), relating to the communication or receipt of restricted data.

**(lvi)** Section 236 of the Atomic Energy Act of 1954 (42 U.S.C. 2284), relating to the sabotage of nuclear facilities or fuel.

**(lvii)** Section 60123(b) of title 49, relating to damaging or destroying a pipeline facility, but only if the conduct which led to the conviction involved a substantial risk of death or serious bodily injury.

**(lviii)** Section 401(a) of the Controlled Substances Act (21 U.S.C. 841), relating to manufacturing or distributing a controlled substance in the case of a conviction for an offense described in subparagraph (A), (B), or (C) of subsection (b)(1) of that section for which death or serious bodily injury resulted from the use of such substance.

**(lix)** Section 276(a) of the Immigration and Nationality Act (8 U.S.C. 1326), relating to the reentry of a removed alien, but only if the alien is described in paragraph (1) or (2) of subsection (b) of that section.

**(lx)** Section 277 of the Immigration and Nationality Act (8 U.S.C. 1327), relating to aiding or assisting certain aliens to enter the United States.

**(lxi)** Section 278 of the Immigration and Nationality Act (8 U.S.C. 1328), relating to the importation of an alien into the United States for an immoral purpose.

**(lxii)** Any section of the Export Administration Act of 1979 (50 U.S.C. 4611 et seq.) [2]

**(lxiii)** Section 206 of the International Emergency Economic Powers Act (50 U.S.C. 1705).

**(lxiv)** Section 601 of the National Security Act of 1947 (50 U.S.C. 3121), relating to the protection of identities of certain United States undercover intelligence officers, agents, informants, and sources.

**(lxv)** Subparagraph (A)(i) or (B)(i) of section 401(b)(1) of the Controlled Substances Act (21 U.S.C. 841(b)(1)) or paragraph (1)(A) or (2)(A) of section 1010(b) of the Controlled Substances Import and Export Act (21 U.S.C. 960(b)), relating to manufacturing, distributing, dispensing, or possessing with intent to manufacture, distribute, dispense, or knowingly importing or exporting, a mixture or substance containing a detectable amount of heroin if the sentencing court finds that the offender was an organizer, leader, manager, or supervisor of others in the offense, as determined under the guidelines promulgated by the United States Sentencing Commission.

**(lxvi)** Subparagraph (A)(vi) or (B)(vi) of section 401(b)(1) of the Controlled Substances Act (21 U.S.C. 841(b)(1)) or paragraph (1)(F) or (2)(F) of section 1010(b) of the Controlled Substances Import and Export Act (21 U.S.C. 960(b)), relating to manufacturing, distributing, dispensing, or possessing with intent to manufacture, distribute, or dispense, a mixture or substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, or any analogue thereof.

**(lxvii)** Subparagraph (A)(viii) or (B)(viii) of section 401(b)(1) of the Controlled Substances Act (21 U.S.C. 841(b)(1)) or paragraph (1)(H) or (2)(H) of section 1010(b) the Controlled Substances Import and Export Act (21 U.S.C. 960(b)), relating to manufacturing, distributing, dispensing, or possessing with intent to manufacture, distribute, or dispense, or knowingly importing or exporting, a mixture of substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers, if the sentencing court finds that the offender was an organizer, leader, manager, or supervisor of others in the offense, as determined under the guidelines promulgated by the United States Sentencing Commission.

**(lxviii)** Subparagraph (A) or (B) of section 401(b)(1) of the Controlled Substances Act (21 U.S.C. 841(b)(1)) or paragraph (1) or (2) of section 1010(b) of the Controlled Substances Import and Export Act (21 U.S.C. 960(b)), relating to manufacturing, distributing, dispensing, or possessing with intent to manufacture, distribute, or dispense, a controlled substance, or knowingly importing or exporting a controlled substance, if the sentencing court finds that--

**(I)** the offense involved a mixture or substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, or any analogue thereof; and

**(II)** the offender was an organizer, leader, manager, or supervisor of others in the offense, as determined under the guidelines promulgated by the United States Sentencing Commission.

**(E) Deportable prisoners ineligible to apply time credits.**--

**(i) In general.**--A prisoner is ineligible to apply time credits under subparagraph (C) if the prisoner is the subject of a final order of removal under any provision of the immigration laws (as such term is defined in section 101(a)(17) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(17))).

**(ii) Proceedings.**--The Attorney General, in consultation with the Secretary of Homeland Security, shall ensure that any alien described in section 212 or 237 of the Immigration and Nationality Act (8 U.S.C. 1182, 1227) who seeks to earn time credits are subject to proceedings described in section 238(a) of that Act (8 U.S.C. 1228(a)) at a date as early as practicable during the prisoner's incarceration.

**(5) Risk reassessments and level adjustment.**--A prisoner who successfully participates in evidence-based recidivism reduction programming or productive activities shall receive periodic risk reassessments not less often than annually, and a prisoner determined to be at a medium or high risk of recidivating and who has less than 5 years until his or her projected release date shall receive more frequent risk reassessments. If the reassessment shows that the prisoner's risk of recidivating or specific needs have changed, the Bureau of Prisons shall update the determination of the prisoner's risk of recidivating or information regarding the prisoner's specific needs and reassign the prisoner to appropriate evidence-based recidivism reduction programming or productive activities based on such changes.

**(6) Relation to other incentive programs.**--The incentives described in this subsection shall be in addition to any other rewards or incentives for which a prisoner may be eligible.

**(e) Penalties.**--The Director of the Bureau of Prisons shall develop guidelines for the reduction of rewards and incentives earned under subsection (d) for prisoners who violate prison rules or evidence-based recidivism reduction program or productive activity rules, which shall provide--

**(1)** general levels of violations and resulting reductions;

**(2)** that any reduction that includes the loss of time credits shall require written notice to the prisoner, shall be limited to time credits that a prisoner earned as of the date of the prisoner's rule violation, and shall not include any future time credits that the prisoner may earn; and

**(3)** for a procedure to restore time credits that a prisoner lost as a result of a rule violation, based on the prisoner's individual progress after the date of the rule violation.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**(f) Bureau of Prisons training.**--The Attorney General shall develop and implement training programs for Bureau of Prisons officers and employees responsible for administering the System, which shall include--

**(1)** initial training to educate officers and employees on how to use the System in an appropriate and consistent manner, as well as the reasons for using the System;

**(2)** continuing education;

**(3)** periodic training updates; and

**(4)** a requirement that such officers and employees demonstrate competence in administering the System, including interrater reliability, on a biannual basis.

**(g) Quality assurance.**--In order to ensure that the Bureau of Prisons is using the System in an appropriate and consistent manner, the Attorney General shall monitor and assess the use of the System, which shall include conducting annual audits of the Bureau of Prisons regarding the use of the System.

**(h) Dyslexia screening.**--

**(1) Screening.**--The Attorney General shall incorporate a dyslexia screening program into the System, including by screening for dyslexia during--

**(A)** the intake process; and

**(B)** each periodic risk reassessment of a prisoner.

**(2) Treatment.**--The Attorney General shall incorporate programs designed to treat dyslexia into the evidence-based recidivism reduction programs or productive activities required to be implemented under this section. The Attorney General may also incorporate programs designed to treat other learning disabilities.

**CREDIT(S)**

(Added Pub.L. 115-391, Title I, § 101(a), Dec. 21, 2018, 132 Stat. 5196.)

**Footnotes**

1  So in original.

2  So in original. Probably should be followed by a period.

18 U.S.C.A. § 3632, 18 USCA § 3632

Current through P.L. 118-70. Some statute sections may be more current, see credits for details.

**End of Document**    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
   Title 28. Judicial Administration
      Chapter V. Bureau of Prisons, Department of Justice
         Subchapter B. Inmate Admission, Classification, and Transfer
            Part 523. Computation of Sentence (Refs & Annos)
               Subpart E. First Step Act Time Credits (Refs & Annos)

28 C.F.R. § 523.40

§ 523.40 Purpose.

Effective: January 19, 2022
Currentness

(a) The purpose of this subpart is to describe procedures for the earning and application of Time Credits as authorized by 18 U.S.C. 3632(d)(4) and Section 101 of the First Step Act of 2018 (Pub.L. 115–391, December 21, 2018, 132 Stat. 5194) (FSA), hereinafter referred to as "FSA Time Credits" or "Time Credits."

(b) Generally, as defined and described in this subpart, an eligible inmate who successfully participates in Evidence–Based Recidivism Reduction (EBRR) Programs or Productive Activities (PAs) that are recommended based on the inmate's risk and needs assessment may earn FSA Time Credits to be applied toward prerelease custody or early transfer to supervised release under 18 U.S.C. 3624(g).

SOURCE: 54 FR 32028, Aug. 3, 1989; 62 FR 50787, Sept. 26, 1997; 70 FR 66754, Nov. 3, 2005; 87 FR 2717, Jan. 19, 2022, unless otherwise noted.

AUTHORITY: 5 U.S.C. 301; 18 U.S.C. 3568 (repealed November 1, 1987, as to offenses committed on or after that date), 3621, 3622, 3624, 3632, 3635, 4001, 4042, 4081, 4082 (repealed in part as to conduct occurring on or after November 1, 1987), 4161–4166 (repealed October 12, 1984, as to offenses committed on or after November 1, 1987), 5006–5024 (repealed October 12, 1984, as to conduct occurring after that date), 5039; 28 U.S.C. 509, 510.

Current through July 17, 2024, 89 FR 58079. Some sections may be more current. See credits for details.

---

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

> Code of Federal Regulations
>   Title 28. Judicial Administration
>     Chapter V. Bureau of Prisons, Department of Justice
>       Subchapter B. Inmate Admission, Classification, and Transfer
>         Part 523. Computation of Sentence (Refs & Annos)
>           Subpart E. First Step Act Time Credits (Refs & Annos)

28 C.F.R. § 523.44

§ 523.44 Application of FSA Time Credits.

Effective: January 19, 2022

Currentness

(a) How Time Credits may be applied. For any inmate eligible to earn FSA Time Credits under this subpart who is:

(1) Sentenced to a term of imprisonment under the U.S. Code, the Bureau may apply FSA Time Credits toward prerelease custody or supervised release as described in paragraphs (c) and (d) of this section.

(2) Subject to a final order of removal under immigration laws as defined in 8 U.S.C. 1101(a)(17) (see 18 U.S.C. 3632(d)(4)(E)), the Bureau may not apply FSA Time Credits toward prerelease custody or early transfer to supervised release.

(3) Serving a term of imprisonment pursuant to a conviction for an offense under laws other than the U.S. Code (see Section 105 of the FSA, Pub.L. 115–391, 132 Stat. 5214 (not codified; included as note to 18 U.S.C. 3621)), the Bureau may not apply FSA Time Credits toward prerelease custody or early transfer to supervised release. This paragraph (a)(3) will not bar the application of FSA Time Credits, as authorized by the DC Code, for those serving a term of imprisonment for an offense under the DC Code.

(b) Consideration for application of FSA Time Credits. Where otherwise permitted by this subpart, the Bureau may apply FSA Time Credits toward prerelease custody or early transfer to supervised release under 18 U.S.C. 3624(g) only if an eligible inmate has:

(1) Earned FSA Time Credits in an amount that is equal to the remainder of the inmate's imposed term of imprisonment;

(2) Shown through the periodic risk reassessments a demonstrated recidivism risk reduction or maintained a minimum or low recidivism risk, during the term of imprisonment; and

(3) Had the remainder of his or her imposed term of imprisonment computed under applicable law.

(c) Prerelease custody. The Bureau may apply earned FSA Time Credits toward prerelease custody only when an eligible inmate has, in addition to satisfying the criteria in paragraph (b) of this section:

(1) Maintained a minimum or low recidivism risk through his or her last two risk and needs assessments; or

(2) Had a petition to be transferred to prerelease custody or supervised release approved by the Warden, after the Warden's determination that:

(i) The prisoner would not be a danger to society if transferred to prerelease custody or supervised release;

(ii) The prisoner has made a good faith effort to lower their recidivism risk through participation in recidivism reduction programs or productive activities; and

(iii) The prisoner is unlikely to recidivate.

(d) Transfer to supervised release. The Bureau may apply FSA Time Credits toward early transfer to supervised release under 18 U.S.C. 3624(g) only when an eligible inmate has, in addition to satisfying the criteria in paragraphs (b) and (c) of this section:

(1) An eligible inmate has maintained a minimum or low recidivism risk through his or her last risk and needs assessment;

(2) An eligible inmate has a term of supervised release after imprisonment included as part of his or her sentence as imposed by the sentencing court; and

(3) The application of FSA Time Credits would result in transfer to supervised release no earlier than 12 months before the date that transfer to supervised release would otherwise have occurred.

SOURCE: 54 FR 32028, Aug. 3, 1989; 62 FR 50787, Sept. 26, 1997; 70 FR 66754, Nov. 3, 2005; 87 FR 2717, Jan. 19, 2022, unless otherwise noted.

AUTHORITY: 5 U.S.C. 301; 18 U.S.C. 3568 (repealed November 1, 1987, as to offenses committed on or after that date), 3621, 3622, 3624, 3632, 3635, 4001, 4042, 4081, 4082 (repealed in part as to conduct occurring on or after November 1, 1987), 4161–4166 (repealed October 12, 1984, as to offenses committed on or after November 1, 1987), 5006–5024 (repealed October 12, 1984, as to conduct occurring after that date), 5039; 28 U.S.C. 509, 510.

Current through July 17, 2024, 89 FR 58079. Some sections may be more current. See credits for details.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 24-2371

I am the attorney or self-represented party.

**This brief contains** 8,775 **words, including** 0 **words** manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⦿ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Hunter Haney **Date** 07/29/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*