CA NO. 24-2371

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| LEON ABEL GONZALEZ,<br><br>      Petitioner-Appellant,<br><br>    v.<br><br>JUAN HERRERA, Bureau of Prisons Residential Reentry Manager for Long Beach, in his official capacity; and COLLETTE PETERS, Director of the Federal Bureau of Prisons, in her official capacity,<br><br>      Respondents-Appellees. | DC NO. 2:23-cv-10554-DSF |

**APPELLANT'S REPLY BRIEF**

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF CALIFORNIA

HONORABLE DALE S. FISCHER
United States District Judge

CUAUHTEMOC ORTEGA
Federal Public Defender
HUNTER HANEY
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081
Email: hunter_haney@fd.org
Attorneys for Defendant-Appellant

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | ARGUMENT | 3 |
| | A. Section 3632's plain text requires application of ETCs to "time in" supervised release. | 3 |
| | B. The FSA's broader context confirms Gonzalez's reading. | 7 |
| | 1. 18 U.S.C. § 3624(g)(1)(D) | 8 |
| | 2. 18 U.S.C. § 3624(g)(10) | 10 |
| | C. The FSA's legislative history supports Gonzalez's interpretation. | 13 |
| | D. The government's policy arguments are unavailing. | 14 |
| | E. This issue has divided federal courts, but the cases favoring Gonzalez's reading are more persuasive. | 18 |
| | F. This Court can and should apply the rule of lenity to resolve any ambiguity in Gonzalez's favor. | 21 |
| | G. Reliance on the BOP's regulations is waived and unwarranted. | 23 |
| | H. There are procedures available to implement reductions in terms of supervised release, and they should be used here. | 26 |
| III. | CONCLUSION | 32 |

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Barber v. Thomas,*
 560 U.S. 474 (2010)..................................................................................22

*Barnett v. Neal,*
 860 F.3d 570 (7th Cir. 2017) ...................................................................28

*Bosky v. Ciccone,*
 262 F. Supp. 533 (W.D. Mo. 1966)..........................................................27

*Bottinelli v. Salazar,*
 929 F.3d 1196 (9th Cir. 2019) .................................................................19

*Cazares v. Hendrix,*
 575 F. Supp. 3d 1289 (D. Or. 2021) ........................................................15

*Davis v. Crabtree,*
 109 F.3d 566 (9th Cir. 1997) ..............................................................21, 23

*DaVita Inc. v. Amy's Kitchen, Inc.,*
 981 F.3d 664 (9th Cir. 2020) .....................................................................5

*Douglas v. Xerox Bus. Servs., LLC,*
 875 F.3d 884 (9th Cir. 2017) ...................................................................19

*Dyer v. Fulgam,*
 No. 21-cv-299, 2022 WL 1598249 (E.D. Tenn. 2022) ...........................18

*Garcia v. United States,*
 469 U.S. 70 (1984)....................................................................................14

*Gonzalez v. Ashcroft,*
 289 F. Supp. 2d 555 (D.N.J. 2003)...........................................................27

*Gorman v. Wolpoff & Abramson, LLP,*
 584 F.3d 1147 (9th Cir. 2009) ...................................................................5

*Guerriero v. Miami RRM,*
 No. 24-10337, 2024 WL 2017730 (11th Cir. 2024)..................................20

ii

# TABLE OF AUTHORITIES

**Page(s)**

*Harris v. Nelson*,
　394 U.S. 286 (1969)................................................................27

*Huihui v. Derr*,
　No. CV 22-00541 JAO-RT, 2023 WL 4086073 (D. Hawaii June
　20, 2023) ...................................................................................10

*Hunt v. National Broadcasting Co.*,
　872 F.2d 289 (9th Cir. 1989) ................................................30

*Koerner v. Grigas*,
　328 F.3d 1039 (9th Cir. 2003) ................................................28

*Komando v. Luna*,
　No. 22-CV-425-SE, 2023 WL 310580 (D.N.H. Jan. 13, 2023) ........................25

*Lafler v. Cooper*,
　566 U.S. 156 (2012)................................................................27

*Lallave v. Martinez*,
　635 F. Supp. 3d 173 (E.D.N.Y. 2022)................................................25

*Lomax v. Ortiz-Marquez*,
　140 S. Ct. 1721 (2020)................................................................7

*Loper Bright Enterprises v. Raimondo*,
　144 S. Ct. 2244 (2024)................................................................23

*Lujan v. Garcia*,
　734 F.3d 917 (9th Cir. 2013) ................................................27

*Lynce v. Mathis*,
　519 U.S. 433 (1997)................................................................22

*Martin v. United States*,
　169 Fed. Cl. 342 (2024)................................................................11

*Miller v. Gammie*,
　335 F.3d 889 (9th Cir. 2003) ................................................7

# TABLE OF AUTHORITIES

**Page(s)**

*Mort v. United States*,
86 F.3d 890 (9th Cir. 1996) ................................................................30

*Morton v. Mancari*,
417 U.S. 535 (1974).........................................................................10

*Pulsifer v. United States*,
601 U.S. 124 (2024)...........................................................................7

*Rivera-Perez v. Stover*,
No. 3:23-cv-1384-SRU, __ F. Supp. 3d __ (D. Conn. Nov. 18,
2024) ...........................................................................19, 20, 21, 30

*Rudisill v. McDonough*,
601 U.S. 294 (2024)..........................................................................30

*Satterlee v. Wolfenbarger*,
453 F.3d 362 (6th Cir. 2006) ...........................................................27

*Schlup v. Delo*,
513 U.S. 298 (1995)..........................................................................26

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944)......................................................................23, 24

*Stein v. Kaiser Found. Health Plan, Inc.*,
115 F.4th 1244 (9th Cir. 2024) .........................................................19

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*,
576 U.S. 519 (2015)............................................................................5

*Turner v. Keyes*,
No. 22-CV-321-WMC, 2022 WL 17338577 (W.D. Wis. Nov. 30,
2022) .............................................................................................22

*United States v. Bainbridge*,
746 F.3d 943 (9th Cir. 2014) ...........................................................31

*United States v. Calabrese*,
No. 11-cr-437, 2023 WL 1969753 (N.D. Ohio Feb. 13, 2023)..........................21

## TABLE OF AUTHORITIES

**Page(s)**

*United States v. Cox*,
796 F. App'x 322 (8th Cir. 2020) ........................................................27

*United States v. Dreyer*,
804 F.3d 1266 (9th Cir. 2015) ...........................................................29

*United States v. Graf*,
610 F.3d 1148 (9th Cir. 2010) ...........................................................25

*United States v. Henry*,
983 F.3d 214 (6th Cir. 2020) .............................................................23

*United States v. Holden*,
452 F. Supp. 3d 964 (D. Or. 2020) ....................................................30

*United States v. Johnson*,
529 U.S. 53 (2000)............................................................................16

*United States v. Korotkiy*,
118 F.4th 1202 (9th Cir. 2024) .......................................................3, 7

*United States v. Lopez*,
998 F.3d 431 (9th Cir. 2021) ...............................................................7

*United States v. Merrell*,
37 F.4th 571 (9th Cir. 2022) .............................................................23

*United States v. Turner*,
689 F.3d 1117 (9th Cir. 2012) ...........................................................22

*United States v. Weir*,
861 F.2d 542 (9th Cir. 1988) ...............................................................8

*United States v. Williams*,
402 F. Supp. 3d 442 (N.D. Ill. 2019)..................................................23

*Weaver v. Graham*,
450 U.S. 24 (1981)............................................................................22

*White v. White*,
925 F.2d 287 (9th Cir. 1991) .............................................................27

# TABLE OF AUTHORITIES

**Page(s)**

*Wilkinson v. Dotson*,
   544 U.S. 74 (2005)........................................................................26, 27

*Williams v. King*,
   875 F.3d 500 (9th Cir. 2017) .......................................................21, 22

*Zavala v. Ives*,
   785 F.3d 367 (9th Cir. 2015) ..............................................................24

**Federal Statutes**

18 U.S.C. § 3553(f)(1) ............................................................................7

18 U.S.C. § 3583 ...................................................................................31

18 U.S.C. § 3601 ...................................................................................31

18 U.S.C. § 3624(b) ...........................................................................4, 22

18 U.S.C. § 3624(b)(1)............................................................................5

18 U.S.C. § 3624(c) ..............................................................................10

18 U.S.C. § 3624(c)(1)......................................................................10, 12

18 U.S.C. § 3624(e) ..............................................................................31

18 U.S.C. § 3624(g)(1)(A) ......................................................................9

18 U.S.C. § 3624(g)(1)(D)....................................................................8, 9

18 U.S.C. § 3624(g)(1)(D)(ii) .................................................................8

18 U.S.C. § 3624(g)(3)......................................................................12, 18

18 U.S.C. § 3624(g)(10) ..............................................................10, 12, 13

18 U.S.C. § 3624(g)(11) ........................................................................15

18 U.S.C. § 3632(d)(4)(C) ...............................................................*passim*

18 U.S.C. § 3632(d)(4)(D)......................................................................17

## TABLE OF AUTHORITIES

**Page(s)**

18 U.S.C. § 3634(7) ........................................................................12

18 U.S.C. § 3635(3)(B) ..................................................................16

18 U.S.C. § 3635(3)(C) ..................................................................16

28 U.S.C. § 2241 ......................................................................26, 27

28 U.S.C. § 2243 ............................................................................26

First Step Act, Pub. L. No. 115-391, 132 Stat. 5194 (2018) ...........*passim*

**Other Authorities**

Bureau of Prisons, Male Pattern Risk Scoring ...............................18

House Judiciary GOP, Oversight of the Federal Bureau of Prisons........................15

Press Release, The White House, President Donald J. Trump Is
   Committed to Building on the Successes of the First Step Act (Apr.
   1, 2019) ....................................................................................1

U.S. Courts, *Residentiary Reentry Centers: Reference Guide* (March
   2020) .......................................................................................13

## I. INTRODUCTION

The First Step Act ("FSA"), Pub. L. No. 115-391, 132 Stat. 5194 (2018), was a "groundbreaking reform" that included "commonsense" changes to make the "justice system fairer and help inmates successfully transition back into society." Press Release, The White House, President Donald J. Trump Is Committed to Building on the Successes of the First Step Act (Apr. 1, 2019), https://perma.cc/M6HS-K6XP. The FSA's system of earned "time credits" ("ETCs") was a central pillar of that reform, providing incarcerated individuals ETCs as an incentive to participate in certain rehabilitative programs, and promising that those ETCs "*shall* be applied toward *time in* prerelease custody or supervised release." 18 U.S.C. § 3632(d)(4)(C) (emphases added).

This appeal involves an important question of first impression regarding the proper interpretation of section 3632(d)(4)(C). Leon Abel Gonzalez earned 610 ETCs through participation in rehabilitative programs and sought to apply them to his "time in prerelease custody" or, alternatively, his "time in…supervised release." The district court concluded that Gonzalez could apply only 237 of his ETCs to "time in prerelease custody[,]" and not the remaining portion to "time in…supervised release[,]" even though both phrases appear in the same clause of 3632(d)(4)(C). However, prohibiting Gonzalez from applying his unused ETCs to his "time in…supervised release" is contrary to the FSA's plain text, context, and

1

purpose. The holding also threatens to drastically curtail the FSA's rehabilitative promise for thousands of individuals like Gonzalez by reducing incentives for programming participation. The government's attempts to argue differently fail to confront Gonzalez's points or otherwise lack merit.

Furthermore, Gonzalez's situation is, as the government now concedes on appeal, highly inequitable. Gonzalez worked to rehabilitate himself and obtain his ETCs. He timely complained about the conceded, widespread failures by the Bureau of Prisons ("BOP") to apply ETCs to reduce terms of prerelease custody such as his. Due solely to the BOP's failures, Gonzalez is now unable to use hundreds of his ETCs unless those ETCs are applied to reduce his supervised release term, just as section 3632(d)(4)(C) requires. Such an outcome is not only the most fair and just way to recognize Gonzalez's strides to further his rehabilitation; it is most consistent with the FSA's goals of incentivizing successful reentry.

District courts are increasingly recognizing that the FSA's requirement that ETCs be "applied" to reduce "time in prerelease custody" correspondingly extends to "time in…supervised release[,]" as well. This Court should follow suit by reversing the district court's decision and ordering that Gonzalez's unused ETCs be applied to reduce his term of supervised release.

2

## II. ARGUMENT

**A. Section 3632's plain text requires application of ETCs to "time in" supervised release.**

Gonzalez's opening brief ("AOB") explained why 18 U.S.C. § 3632(d)(4)(C)'s plain text unambiguously requires that ETCs be applied to both "time in" prerelease custody and supervised release, as well as several flawed aspects of the government's (and the district court's) contrary textual analysis. (AOB-13–21) The government's answering brief ("GAB") largely repeats the same misguided arguments without engaging with Gonzalez's counterpoints, and its new arguments otherwise lack merit.

The government complains that Gonzalez hasn't addressed its dictionary definition of "toward" and has otherwise omitted definitions from his analysis. (GAB-13 & n.2) These complaints neglect Gonzalez's specific explanation of why the definition of "toward" used by the government and the district court is inapt. (AOB-17–21 (showing why district court's choice of definition of "toward" and attempt to address the import of "time in" were conclusory)) The *aptitude* of a definition as informed by the linguistic and broader statutory context is the lynchpin of statutory interpretation. (GAB-14); *see, e.g.*, *United States v. Korotkiy*, 118 F.4th 1202, 1210–13 (9th Cir. 2024) (common-sense examination of linguistic and statutory context informs which dictionary definition is preferred). Thus,

3

whether Gonzalez has excluded every alternative definition is unimportant because Gonzalez has shown why his definition is most applicable.

It is therefore the government—and not Gonzalez—who avoids the infirmities in its textual analysis. For one, the government disregards that its reading rewrites "time in" as "time before[.]" (AOB-18–19, 21) It also skates over the similarly phrased sentence-credit statutes that operate consistently with Gonzalez's reading. (AOB-19–20) And finally, it declines to address Gonzalez's several examples showing that his reading is most plausible and rooted in common sense. (AOB-19, 23, 29)

Rather than confront these existing flaws, the government devises several new, but equally defective, arguments. The government suggests that section 3632(d)(4)(C)'s use of "applied"—instead of "credited"—is "significant" because "credited" is used differently in section 3624(b). (GAB-13–14)[1] Initially, the choice of the word "applied" favors Gonzalez because "apply" means "put to use[.]" (AOB-15) Gonzalez's "put[ting]" his time credits "to use" is something the government acknowledges (without providing an alternative definition of "apply")

---

[1] Despite citing the canon that Congress's choice of differing language in two statutory provisions is presumptively intentional, the government again fails to respond to Gonzalez's arguments relying on the same canon. (AOB-24 n.5)

4

Gonzalez cannot accomplish because the "BOP" declined to "calculate[] [them] at an earlier point[,]" despite Gonzalez's request for it to do so. (GAB-32)

In any case, the government's premise is wrong. Because the "credited" language wasn't new to the FSA, but carried over from a predecessor statute, the choice of words isn't as deliberate as the government portrays it. 132 Stat. 5210 (striking existing language, including "credited[,]" and inserting other language, including "credited"); 18 U.S.C. § 3624(b)(1) (2008). And, as the government's repeated use of "apply" when it means "credit" illustrates, "credit" and "apply" are interchangeable in this context. (GAB-16, 20 (discussing how "time credits are applied"); GAB-24 (similar)) Indeed, the most likely explanation for the choice of words is that to "credit" a "time credit" is awkward language, which this Court should presume Congress intended to avoid. *See, e.g.*, *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1156 (9th Cir. 2009) ("Where, as here, there are convincing alternative explanations for a difference in statutory language, the presumption applies with much less force."); *see also DaVita Inc. v. Amy's Kitchen, Inc.*, 981 F.3d 664, 673 (9th Cir. 2020) (differing statutory language "irrelevant" where using identical language would have made provision "'awkward and unclear'" (quoting *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 535 n.17 (2015))).

5

Nor did Congress intend for credits to be applied differently between "time in prerelease custody" and "time in…supervised release[,]" as the government's reading requires. (AOB-17–18) The government disputes that its reading is inconsistent because "early entry" is allowed "into *both*[.]" (GAB-16 n.3 (emphasis in original)) But just after Gonzalez uncontestably exposed one of the government's other core textual arguments as a straw man (AOB-22 (explaining how the government's argument related to section 3632(d)(4)(C)'s transfer requirement is a straw man); *see* GAB-14–15 (declining to respond)), the government has reconstituted yet another to burn down. The relevant inconsistency is rooted not in how the statute affects someone's custodial status, but in how their "[t]ime credits" are applied to their "time": that time credits, under the government's view, can reduce "time in prerelease custody" but not "time in…supervised release." (AOB-17–18) It is *that* dissonance which remains unexplained.

Similarly lacking explanation is the government's allegation that Gonzalez's construction is "plausible" only by eliminating the words "time in." (GAB-15) As Gonzalez has demonstrated, the phrase "time in" shows the imperative of applying his ETCs to reduce his term of supervised release, while "time in" is superfluous under the government's reading. (AOB-18–21) Indeed, when comparing a hypothetical statute stating that "[t]ime credits…shall be applied [to bring]

6

prerelease custody or supervised release [closer to happening]" with a statute stating that "[t]ime credits…shall be applied [to bring] *time in* prerelease custody or supervised release [closer to happening][,]" the purpose that "time in" serves is unclear. Thus, the government's reading makes "time in" expendable, while Gonzalez's reading is the only one affording "time in" meaning. *E.g.*, *Korotkiy*, 118 F.4th at 1214 (statute must be construed to give effect to all of its parts).

In the end, this is a case in which the plain text is so unambiguous that the analysis "begins, and pretty much ends, with [the] text." *Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721, 1724 (2020). Because the FSA's text plainly requires application of ETCs to "time in… supervised release[,]" this Court should "enforce it according to its terms." (GAB-12 (quotation omitted))[2]

## B.  The FSA's broader context confirms Gonzalez's reading.

Other FSA provisions support Gonzalez's entitlement to apply his unused ETCs to reduce his term of supervised release. (AOB-21–25) Gonzalez already

---

[2] The government's point that *United States v. Lopez*, 998 F.3d 431 (9th Cir. 2021) was abrogated by the Supreme Court in *Pulsifer v. United States*, 601 U.S. 124 (2024) isn't the "gotcha" that it suggests. (GAB-21 n.4) Gonzalez cited *Lopez* only for methodological points regarding statutory interpretation and broader pronouncements regarding the FSA, not for *Lopez*'s holding regarding the FSA's amendments to safety-valve provisions of 18 U.S.C. § 3553(f)(1). Because *Pulsifer* abrogated only the latter analysis, 601 U.S. at 141, Gonzalez's citations to *Lopez* are on point. *See, e.g.*, *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc) (a lower court's decision is abrogated by higher authority only to the extent that its existing decisions are "clearly irreconcilable" with that new precedent).

7

illustrated why section 3624(g)(3) and section 3624(g)(1)(A) don't prevent—and actually align with—his proposed use of his ETCs. (AOB-24) The government repeats the same arguments related to these provisions that it raised below (and which the district court adopted), declining to engage with Gonzalez's explanations of why those arguments are mistaken. (GAB-16–17) Because this Court, of course, performs "plenary" review of questions of statutory interpretation, *e.g.*, *United States v. Weir*, 861 F.2d 542, 545 (9th Cir. 1988), it can and should require more of the government than a "take it or leave it" approach to statutory interpretation— particularly on an important issue such as this one.

Maybe realizing the weakness of its existing contextual arguments, the government now focuses on sections 3624(g)(1)(D) and 3624(g)(10), arguing that Gonzalez's reading would also render those provisions superfluous. (GAB-18–19) These arguments are on even shakier footing.

      *1.    18 U.S.C. § 3624(g)(1)(D)*

Section 3624(g)(1)(D) defines who is an "eligible prisoner" for the purpose of "being placed in prerelease custody" or "supervised release[.]" For an individual to be placed in supervised release, the BOP must determine that individual is a "minimum or low risk" to recidivate pursuant to the individual's last risk and needs assessment. 18 U.S.C. § 3624(g)(1)(D)(ii). The government contends that applying ETCs to reduce a term of supervised release "circumvent[s]" the provision's

"eligibility limitations" and would permit "time credits to be used to reduce the total time on supervision for an inmate who was deemed too risky to obtain early transfer out of prison." (GAB-18)

The government doesn't elaborate, but the provision at issue illustrates the argument's faultiness. Regardless of whether supervised release can be reduced through application of ETCs, no individuals too "risky" to obtain an early transfer are ever transferred to supervised release for the simple reason that they must score a "minimum or low risk to recidivate" on a "risk and needs assessment" to be "eligible" for a transfer. 18 U.S.C. § 3624(g)(1)(A), (D). Under section 3624(g)(1)(D), "eligibil[ity]" is a prerequisite for applying *any* FSA time credits to effectuate any transfer, whatever that person's status. 18 U.S.C. § 3632(d)(4)(C) ("The Director of the Bureau of Prisons shall transfer *eligible* prisoners, as determined under section 3624(g), into prerelease custody or supervised release." (emphasis added)). So, any individual whose supervised release might be reduced by applying their ETCs would have already been found to be a "minimum or low risk," and entitled "to obtain early transfer out of prison." Put another way, the benefits of section 3632(d)(4)(C)—including reductions in terms of both prerelease custody or supervised release—cannot, by the terms of this statutory scheme, apply to incarcerated individuals who were never eligible for a "transfer." Reducing an individual's supervised release wouldn't be "circumvent[ing]" the FSA's transfer

9

eligibility requirements, but is squarely aligned with their design. *See, e.g.*, *Morton v. Mancari*, 417 U.S. 535, 551 (1974) ("when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective").

      2.     *18 U.S.C. § 3624(g)(10)*

Nor is Gonzalez's reading undermined by section 3624(g)(10). That provision states that "[t]he time limits under subsections (b) and (c) shall not apply to prerelease custody under this subsection [relating to prerelease custody and supervised release under the FSA]." Subsection (b) provides a system of good-time credits, and subsection (c) governs prerelease custody, separate from the FSA. *See, e.g.*, *Huihui v. Derr*, No. CV 22-00541 JAO-RT, 2023 WL 4086073, at *6 (D. Hawaii June 20, 2023) (summarizing the difference between good-time credits and prerelease custody under the FSA and Second Chance Act, 18 U.S.C. § 3624(c)). Section 3624(c)(1), like subsection (b)(1), is generally applicable to all prisoners and specifies that the BOP "shall, to the extent practicable, ensure that a prisoner serving a term of imprisonment spends a portion of the final months of that term (not to exceed 12 months)" in prerelease custody.

The government contends that the FSA's "enlargement of prerelease custody time would be rendered irrelevant if § 3632(d)(4)(C) is interpreted as *reducing* the time a defendant spends in prerelease custody or the imposed term of supervised

10

release." (GAB-19 (emphasis in original)) This confusing argument seems to reference the government's contention that because section 3632(d)(4)(C) only permits ETCs to be used to bring a prerelease custody or supervised-release term "closer to happening," it doesn't actually "reduc[e]" those terms. (GAB-13) But the government hasn't articulated the metric by which a term becomes "closer to happening" if not by "reducing" it by some amount of earned credits. A "plain reading" of section 3632(d)(4) makes obvious that ETCs are used for actual "sentence reductions" that incentivize participation in recidivism-reducing programming. *Martin v. United States*, 169 Fed. Cl. 342, 345 (2024). Indeed, the government elsewhere argues that "reduc[tions]" of time are precisely what the FSA requires for prerelease custody, but not supervised release. (GAB-14 ("Transferring prisoners into supervised release is exactly what the first sentence [of section 3632(d)(4)(C)] contemplates—*reducing* a term of imprisonment to begin supervised release earlier." (emphasis added)); *see also* GAB-15 (section 3632(d)(4)(C) "*clearly* indicates…time credits are to be used to *reduce* incarceration time" (emphases added, quotation omitted))[3]

---

[3] These arguments further undercut the government's claim that its interpretation of section 3632(d)(4)(C) doesn't treat prerelease custody and supervised release differently. *See supra* Part II.A.

Regardless, section 3624(g)(10) retains significant meaning irrespective of whether ETCs can shorten supervised release. Should the BOP determine that an eligible individual may benefit from serving prerelease custody beyond the Second Chance Act's one-year limit, section 3624(g)(10) affords the BOP that flexibility (and resulting cost savings). *See generally* 18 U.S.C. § 3634(7) (directing the Attorney General to report on "budgetary savings resulting from" ETC provisions, including "savings resulting from the transfer of prisoners into prerelease custody").

One can easily imagine an individual who has earned enough ETCs—say, three years (or 1095 credits)—to make the waiver extremely impactful. Because that individual can only apply up to 12 months (365 days) of FSA ETCs to early transfer to supervised release, 18 U.S.C. § 3624(g)(3), their remaining ETCs could be utilized only for more time in prerelease custody, or, accepting Gonzalez's reading, to reduce their term of supervised release. Absent section 3624(g)(10), only 12 months (365 days) of prerelease custody would be allowed under section 3624(c)(1) (potentially all used for early transfer to supervised release), with the remaining two years of credits applied to reduce the term of supervised release. But the existence of the section 3624(g)(10) waiver permits a longer term of prerelease custody to advance that individual's rehabilitation, or, failing that, a reduction in supervised release. *See* 18 U.S.C. § 3624(c)(1) (prerelease custody is

12

designed to "afford…prisoner a reasonable opportunity to adjust to and prepare for…reentry"); *see also* Administrative Office of U.S. Courts, *Residentiary Reentry Centers: Reference Guide* (March 2020), at 6, *available at* https://perma.cc/3XDY-VTMG (goal of prerelease custody is to "help the person successfully transition back into society" including providing trainings, treatment, and release preparation, among other things). Section 3624(g)(10) therefore serves a critical role even under Gonzalez's reading of the FSA.

\* \* \*

All told, the government's contextual arguments, both new and existing, don't have a leg to stand on, and Gonzalez's reading is most harmonious with the FSA's broader context.

## C.     The FSA's legislative history supports Gonzalez's interpretation.

Legislative history, including that the FSA was specifically amended to expand application of ETCs to supervised release, further supports Gonzalez's interpretation. (AOB-25–27) Ignoring this history, the government newly invokes certain floor statements to buttress its contrary position. (GAB-25–26) None of these statements, however, speaks to anything more than the availability of credits for prerelease custody purposes. They scarcely undermine the history Gonzalez has cited supporting an *additional* entitlement to use ETCs to reduce supervised release. (AOB-27) Ultimately, the "isolated[,]" off-topic remarks cited by the

13

government are "not impressive legislative history[,]" particularly where, as here, other statements more directly addressing the relevant interpretative question "counterbalance" the remarks. *Garcia v. United States*, 469 U.S. 70, 78 (1984) (quotation omitted).

**D.      The government's policy arguments are unavailing.**

Gonzalez's opening brief refuted the government's prior contention that people in Gonzalez's shoes could be incentivized to partake in more programs only by promising an earlier end to incarceration, and not by reductions to their term of prerelease custody or supervised release. (AOB-27–30; ER-101 ("The First Step Act would provide *no motivation* for prisoners to participate in EBRRs or PAs if the incentive were shortened period of prerelease custody or supervised release." (emphasis added))) The government has wisely modified its position, now arguing that allowing a longer term of prerelease custody (but not a reduction in supervised release) is an adequate incentive for incarcerated individuals to participate in programming. (GAB-32–33) It also asserts that Gonzalez's argument undermines the purposes of supervised release. (GAB-22) Neither argument withstands scrutiny.

Applying ETCs to lengthen prerelease custody, as section 3632(d)(4)(C) requires, would be a strong incentive, were the government holding up its end of the bargain by timely applying ETCs to accelerate prerelease custody. It is, by its

14

own admission, not doing so. (GAB-32; AOB-23 n.4; AOB-30)[4] Moreover, the government doesn't counter Gonzalez's argument that a system guaranteeing the *additional* incentive of a reduction of supervised release—which, given the current shortcomings in the administration of the FSA, is the only way to fully use ETCs—promotes more participation than a system without that benefit. (AOB-28–30) While the government claims there is no "requirement" that ETCs be fully used (GAB-32–33), this argument ignores section 3632(d)(4)(C)'s irrefutably mandatory language. *See* 18 U.S.C. § 3632(d)(4)(C) ("Time credits…*shall* be applied toward time in prerelease custody or supervised release" (emphasis added)). As a result, the more "modest potential" incentive the government proposes cannot be squared with the FSA's plain "language" and the broader remedial purposes reflected in its "legislative history." *See, e.g., Cazares v. Hendrix*, 575 F. Supp. 3d 1289, 1301 (D. Or. 2021) (declining to adopt narrower construction of FSA because it would "water down" incentives).

---

[4] Recently, appellee Peters acknowledged in sworn testimony before Congress that the BOP hasn't "compl[ied] with the First Step Act" by timely applying ETCs to permit transfers to prerelease custody. *See* House Judiciary GOP, Oversight of the Federal Bureau of Prisons, at 2:05:46-2:06:51, available at https://www.youtube.com/live/fqwvjvDaWPY?si=YNvwoRdvZohG4Q3F&t=7546 ; *see also* 18 U.S.C. § 3624(g)(11) ("The Director of the Bureau of Prisons shall ensure there is sufficient prerelease custody capacity to accommodate all eligible prisoners.").

In contrast, encouraging participation in rehabilitative programming through application of ETCs to supervised release is entirely consistent with the goals of supervised release. (AOB-31–32) Gonzalez already distinguished *United States v. Johnson*, 529 U.S. 53, 59 (2000) as preceding the FSA, and explained why his arguments were still faithful to the purposes of supervised release discussed in *Johnson*. (*Id.*)

The government largely elides these points (GAB-21–22), but insists that supervised release serves the separate purpose of "facilitat[ing]…reintegration…into the community[,]" and that "objective would be unfulfilled" were ETCs applied to reduce supervised release. (GAB-22 (quotation omitted)) Again, this is a problem of the government's own making: were the FSA's time-credit scheme properly administered, ETCs could be applied first toward prerelease custody, leaving no unused amounts to reduce supervised release. (AOB-23 n.4; AOB-30) Further, one of Congress's express purposes in incentivizing the recidivism reduction programming required to obtain ETCs was, as with supervised release, to facilitate rehabilitation, *e.g.*, community "reintegration[,]" as reflected by it statutorily defining these programs as such. (AOB-25–27, 31–32); *see, e.g.*, 18 U.S.C. § 3635(3)(B) & (C) (evidence-based recidivism reduction program is an activity "designed to help prisoners succeed in

16

their communities upon release from prison" and may include "reintegrative community services[,]" among other things).

The government also speculates that those "who served the lengthiest terms of imprisonment, thereby potentially accumulating the most time credits, would be most likely to have their terms of supervised release eliminated altogether[.]" (GAB-22) Its premise is again mistaken: many individuals with long sentences are statutorily precluded from earning credits due to the nature of their offense, 18 U.S.C. § 3632(d)(4)(D), and otherwise must maintain a "minimum or low" risk level for a specified duration to earn credits at a higher rate, *id.* § 3632(d)(4)(A)(i)-(ii). Ultimately, to be transferred to supervised release, they must maintain that "minimum or low" risk level until their last reassessment. *Id.* § 3624(g)(1)(B), (D)(ii).[5]

Almost none of the long-term prisoners hypothesized by the government can accomplish that even halfway through their term. This is because their PATTERN score will be too high to reach a "minimum or low" risk level, and their PATTERN

---

[5] To be transferred to prerelease custody, they must maintain a minimum or low risk level for their last two reassessments, or the Warden must make a determination that they are low risk (*i.e.*, present no danger to society and won't recidivate). *Id.* § 3624(g)(1)(B), (D)(i). The government's hypothetical also assumes the BOP can permissibly continue to refuse to apply FSA ETCs to prerelease custody; under a correctly administered program, all of these contemplated individuals would have their ETCs apply to prerelease custody, leaving no ETCs to "eliminate[]" supervised release "altogether[.]"

scoring won't be sufficiently reduced until they participate in additional programming and age significantly, among other factors. *See* Bureau of Prisons, Male Pattern Risk Scoring, *available at* https://perma.cc/7Q4S-4TWH.

These considerations ensure that any such individual isn't achieving the windfall the government suggests. Rather, individuals receiving such a benefit, like Gonzalez, will have been amply prepared to "reintegrat[e]…into the community" upon release due to ETCs they have rightfully earned through the rehabilitative programs contemplated by Congress. Thus, in the government's hypothetical (which, again, is only a *possibility* because of the BOP's ongoing refusals to apply ETCs promptly), the purposes of supervised release will have been fully served.[6]

**E.     This issue has divided federal courts, but the cases favoring Gonzalez's reading are more persuasive.**

There is a deepening rift among district courts regarding the provisions at issue. (AOB-32–34 & n.8) The government claims one of the several cases supporting Gonzalez's position, *Dyer v. Fulgam*, No. 21-cv-299, 2022 WL 1598249 (E.D. Tenn. 2022), is a mere "outlier[.]" (GAB-28) But it then cherry-

---

[6] Gonzalez's minimum term of supervised release is irrelevant. (GAB-22–23) The FSA unquestionably permits an early start to supervised release even where the resulting carceral term is below the statutory minimum. 18 U.S.C. § 3624(g)(3). Congress rationally could have made a similar judgment as to the length of supervised release for individuals like Gonzalez who have, through programming participation, made strides to "promote [their] rehabilitation and deter recidivism." (GAB-23; *see* AOB-27–32)

picks just one of the several cases Gonzalez has cited as aligning with *Dyer* to broadly claim that "most" of Gonzalez's cases involve dicta. (GAB-29–30) Even assuming the truth of that assertion, that so many courts have agreed with Gonzalez's position, even *if* in dicta, underscores its reasonableness. *See, e.g.*, *Douglas v. Xerox Bus. Servs., LLC*, 875 F.3d 884, 890 (9th Cir. 2017) (dictum that merely "gesture[s] favorably" to an interpretation can support that reading as "permissible interpretation of [a] statute"). As the government acknowledges, this Court observed, in dictum, that FSA ETCs can "'shorten…supervised release[.]'" (GAB-29 (quoting *Bottinelli v. Salazar*, 929 F.3d 1196, 1200 (9th Cir. 2019))) Dicta from this Court's published decisions, well-reasoned or otherwise, is at least "persuasive and informative." *Stein v. Kaiser Found. Health Plan, Inc.*, 115 F.4th 1244, 1249 (9th Cir. 2024) (en banc) (Forrest, J., concurring).

More importantly, the number of district courts aligning with *Dyer* and Gonzalez's interpretation of the FSA is growing. *See Rivera-Perez v. Stover*, No. 3:23-cv-1384-SRU, __ F. Supp. 3d __, 2024 WL 4819250 (D. Conn. Nov. 18, 2024). In *Rivera-Perez*, the court ordered that a habeas petitioner's FSA credits be applied to his supervised-release term pursuant to section 3632(d)(4)(C), holding, by way of a detailed statutory analysis, that while the word, "toward," read "in isolation[,]" may mean to bring something closer to happening, that isn't the case in the context of "[a]pplying credits[,]" where it "ordinarily means reducing that

19

thing." *Id.* at *6. Like "applying a store credit toward the cost of an item" or a "credit toward one's account balance[,]" a credit "'applied toward time in…supervised release'…clearly suggests that FSA credits are to be applied to reduce a term of supervised release." *Id.* (reasoning that any other conclusion would "go against the fundamental principle that statutory language must be read in its context"). The court rejected the government's similar arguments regarding adjacent provisions of the FSA, *id.* at *7, and further concluded, consistent with Gonzalez's arguments here, that incentivizing rehabilitation through programming "serve[s] the same goals" as supervised release. *Id.* at *8. *Rivera-Perez* is thus another compelling data point reflecting the accumulating qualitative strength of Gonzalez's position. *See id.* (even if majority of courts agreed with the government's construction, this doesn't "mean the construction is correct" (cleaned up)).

This trend hasn't been disturbed by the recent unpublished Eleventh Circuit decision cited by the government. (GAB-13 (citing *Guerriero v. Miami RRM*, No. 24-10337, 2024 WL 2017730 (11th Cir. 2024))) Like the district court cases that the government relies on, *Guerriero* involved a petitioner who, unlike Gonzalez, was uncounseled and doesn't appear to have raised developed arguments on this issue. (AOB-33); *see Guerriero*, 2024 WL 2017730, at *2–3 (not discussing any specific interpretive arguments advanced by Guerriero). And, like most of the

20

government's cases (AOB-33), *Guerriero* relied almost exclusively on *United States v. Calabrese*, No. 11-cr-437, 2023 WL 1969753 (N.D. Ohio Feb. 13, 2023) for support. But Gonzalez has shown why *Calabrese* relied on flawed logic (AOB-34), and the government hasn't ventured to respond to those points. *See Rivera-Perez*, 2024 WL 4819250, at *7 (casting doubt on *Guerriero* and *Calabrese*). *Guerriero*, of course, isn't binding, and, as explained, isn't persuasive, either. *See, e.g.*, *Williams v. King*, 875 F.3d 500, 505 (9th Cir. 2017) (out-of-circuit cases not persuasive where issue not examined "in much detail" or persuasively).

Therefore, and in accordance with several district courts to have opined on the issue (including, but not limited to, *Dyer* and *Rivera-Perez*), this Court should formally adopt the position it suggested in *Bottinelli* and hold that Gonzalez ETCs "shall be applied toward [his] time in…supervised release[.]" 18 U.S.C. § 3632(d)(4)(C).

**F.      This Court can and should apply the rule of lenity to resolve any ambiguity in Gonzalez's favor.**

Any ambiguity remaining after applying the above interpretive tools should be resolved in Gonzalez's favor under the rule of lenity. (AOB-35 (citing *Davis v. Crabtree*, 109 F.3d 566 (9th Cir. 1997))) The government counters that the rule of lenity doesn't apply to BOP time-credit programs (GAB-33–35), but declines to address *Davis*'s explanation that time-credit schemes fall under the rule of lenity because lenity applies "not only to interpretations of the substantive ambit of

21

criminal provisions, but also to the penalties they impose." *Id.* at 570 (quotation omitted).

That holding is correctly applied to the provisions here, which are not just codified in Title 18—Crimes and Criminal Procedure—in a chapter entitled Postsentence Administration, but ultimately decide the length of incarceration and supervised release. *See, e.g.*, *Lynce v. Mathis*, 519 U.S. 433, 441, 445–47 (1997) (time-credit statute affects ultimate penalty imposed); *see also, e.g.*, *United States v. Turner*, 689 F.3d 1117, 1125 (9th Cir. 2012) (applying rule of lenity to statute "implicating [defendant's] supervised release, which is part and parcel of his criminal sentence"). Such penalties are undoubtedly a "significant factor entering into both the defendant's decision to plea bargain and the judge's calculation of the sentence to be imposed." *Weaver v. Graham*, 450 U.S. 24, 32 (1981).

Several courts have thus applied the rule of lenity to the FSA, both to time-credit provisions, *e.g.*, *Turner v. Keyes*, No. 22-CV-321-WMC, 2022 WL 17338577, at *4 (W.D. Wis. Nov. 30, 2022) (18 U.S.C. § 3632(d)(4)(D)); *cf. Barber v. Thomas*, 560 U.S. 474, 488 (2010) ("assuming for present purposes" that the rule of lenity applied to time credits under 18 U.S.C. § 3624(b))[7], and

---

[7] The government's section 3624(b) lenity cases (GAB-34) precede both the FSA's amendments to section 3624(b), and *Barber*'s recognition of a contrary view of the rule of lenity.

otherwise, *see, e.g.*, *United States v. Merrell*, 37 F.4th 571, 577 (9th Cir. 2022) (applying rule to FSA provision amending enhanced sentence scheme for crimes of violence involving use of firearms); *United States v. Henry*, 983 F.3d 214, 225 (6th Cir. 2020) (similar, citing FSA's broad remedial purposes); *United States v. Williams*, 402 F. Supp. 3d 442, 448 (N.D. Ill. 2019) (similar, as to FSA's amendment to sentence-reduction procedure).

In recognition of the substantial penalties at issue, this Court should adhere to its precedents applying the rule of lenity to time-credit provisions such as those in question here, and construe any ambiguity in Gonzalez's favor. *See, e.g.*, *Davis*, 109 F.3d at 570.

## G. Reliance on the BOP's regulations is waived and unwarranted.

The government seems to acknowledge that any regulatory deference argument is on weak footing following *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2267 (2024)'s overruling of *Chevron* deference. (GAB-24–25) But it still urges this Court defer to the BOP's regulations insofar as the Court may "consider the [BOP's] 'body of experience and informed judgment'" regarding administering FSA ETCs in interpreting the statute. (GAB-24–25 (quoting *Loper Bright*)) This language is a direct quotation from *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), a case that established the familiar principle of *Skidmore*

23

deference. However, *Skidmore* deference is both waived and otherwise inappropriate.

*Skidmore* deference is grounded in a need to rely on agency interpretations premised on "specialized experience and broader investigations and information" than what the court has. 323 U.S. at 139. To justify *Skidmore* deference, the agency must show its "interpretation's thoroughness, rational validity, consistency with prior and subsequent pronouncements, the logic and expertness of an agency decision, the care used in reaching the decision, as well as the formality of the process used." *Zavala v. Ives*, 785 F.3d 367, 375 n.10 (9th Cir. 2015) (quotation omitted).

In *Zavala*, this Court assessed whether deferring, under *Skidmore*, to a BOP Program Statement regarding sentencing credit for time in immigration detention was appropriate. 785 F.3d at 375 n.10. Because the Program Statement only cited a few cases supporting the BOP's interpretation of the relevant statute, and there was no other evidence of the agency's "logic, expertise, and thoroughness needed to trigger [*Skidmore*] deference[,]" the Court declined to apply *Skidmore* deference. *Id.*

Here, the government never urged regulatory deference of any kind in its opposition to Gonzalez's petition. (AOB-36) Its answering brief applies none of the above-discussed *Skidmore* deference factors. The government's failure to

24

develop this claim, as it must, is fatal. *See, e.g.*, *United States v. Graf*, 610 F.3d 1148, 1166 (9th Cir. 2010) ("passing" and citationless arguments "are generally deemed waived").

At any rate, and for several reasons Gonzalez has explained (AOB-35–38), *Skidmore* deference isn't justified. Interpreting the FSA's time-credit scheme doesn't require "specialized experience[,]" and the government's conclusory arguments otherwise are devoid of the reasoning this Court required of the BOP in *Zavala*. As one district court recently observed:

> It is undeniably true that the BOP has expertise in prison administration in general, and, in particular, in placing prisoners in different types of custodial settings, in calculating sentence credits, and in releasing them from custody. Such expertise, however, is not determinative of whether this court should defer to the BOP's interpretation of the FSA earned time credit provisions. Earned time credits under the FSA are a new type of sentence credit which operate independently of pre-existing credit systems and incentive programs. The agency's generalized experience administering prisons does not provide a compelling reason for this court to defer under *Skidmore*.

*Komando v. Luna*, No. 22-CV-425-SE, 2023 WL 310580, at *7 (D.N.H. Jan. 13, 2023), *report and recommendation approved sub nom. Komando v. FCI Berlin, Warden*, No. 22-CV-425-SE, 2023 WL 1782034 (D.N.H. Feb. 6, 2023); *accord Lallave v. Martinez*, 635 F. Supp. 3d 173, 186 (E.D.N.Y. 2022) (declining to afford *Skidmore* deference to BOP's interpretation of FSA time-credit scheme because BOP provided no explanation).

25

Summing up, section 3632 plainly and unambiguously establishes Gonzalez's entitlement to apply his FSA credits to his term of supervised release. (AOB-13–21) But *if* this Court finds ambiguity after exhausting the tools of statutory interpretation, this is a case in which the principles undergirding the rule of lenity easily overcome any rationale for administrative deference.

**H.    There are procedures available to implement reductions in terms of supervised release, and they should be used here.**

For the first time in this litigation, the government contends there is no procedure available to implement the reduction in supervised release that Gonzalez has earned because the BOP lacks authority to alter a term of supervised release. (GAB-19–20, 23–24) Acknowledging this outcome is the sole product of the BOP's disregard of Gonzalez's requests to use his ETCs, the government, to its credit, now concedes there is "no doubt that equitable considerations of great weight" are present here. (GAB-32 (quotation omitted)) The government is right on the latter point, but wrong on the former point.

While the BOP cannot change a term of supervised release, federal courts *do* have authority to reduce Gonzalez's supervised-release term, as his 28 U.S.C. § 2241 petition originally explained. (ER-30–32; *see* ER-127–28, 138, 140, 143–44) A district court may "dispose of [a habeas petition] as law and justice require." 28 U.S.C. § 2243; *see Schlup v. Delo*, 513 U.S. 298, 319 (1995) ("habeas corpus is, at its core, an equitable remedy"); *see also Wilkinson v. Dotson*, 544 U.S. 74, 87

26

(2005) (Scalia, J., concurring) (section 2243's remedial provision applies to "*all* federal habeas proceedings" including section 2241 petitions (emphasis in original)). This remedial authority is "broad[,]" *Lujan v. Garcia*, 734 F.3d 917, 933 (9th Cir. 2013) and isn't limited to ordering release from custody, *Satterlee v. Wolfenbarger*, 453 F.3d 362, 370 (6th Cir. 2006) (citations omitted). "The very nature of the writ demands that it be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected." *Harris v. Nelson*, 394 U.S. 286, 291 (1969).

It thus encompasses not just wrongfully withheld good-time credits, *Wilkinson*, 544 U.S. at 79, but expungement, *White v. White*, 925 F.2d 287, 292 (9th Cir. 1991), transferring a case to another court, *United States v. Cox*, 796 F. App'x 322 (8th Cir. 2020) (unpublished), requiring a warden to complete forms necessary to admit someone to a hospital, *Bosky v. Ciccone*, 262 F. Supp. 533, 534 (W.D. Mo. 1966), ordering the State to reoffer a plea agreement, *Lafler v. Cooper*, 566 U.S. 156, 174 (2012), and granting release unless the petitioner takes some other remedial action, *Lujan*, 734 F.3d at 933.

Further examples involve remedies that a prison warden themselves might lack authority to provide. *See, e.g.*, *Gonzalez v. Ashcroft*, 289 F. Supp. 2d 555, 568 (D.N.J. 2003) (deeming deported habeas petitioner's petition filed nunc pro tunc to satisfy "custody" requirement under equitable authority, even though warden could

27

not release petitioner or provide other relief). Myriad cases reflect that the most appropriate habeas remedy is often one that "only the judicial branch" can dispense. *See, e.g.*, *Barnett v. Neal*, 860 F.3d 570, 573 (7th Cir. 2017) (habeas court's broad equitable authority includes granting state executive more time to resolve whether state courts would permit new appeal with constitutionally effective counsel).

Invoking several of these authorities below, Gonzalez argued that the district court was empowered to, as a matter of equity, apply his ETCs to reduce his supervised release, anticipating the concern that the BOP was powerless to do so. (ER-30–32) But no such concern was raised, and the district court declined to order equitable relief, finding, without elaboration, that a reduction wasn't "warranted based on the facts in the record." (ER-7) Lacking any indication of a dispute over whether his claims were cognizable, Gonzalez's opening brief didn't challenge the district court's refusal to exercise its equitable authority. (AOB-9–10 n.3) But the government's new stance has materially altered the equitable relief landscape, warranting modification of Gonzalez's initial position. *See, e.g.*, *Koerner v. Grigas*, 328 F.3d 1039, 1048 (9th Cir. 2003) (setting forth exceptions to general rule that this Court won't consider arguments not raised in appellant's opening brief, including good cause or when an issue is raised in the appellee's brief or addressing issue doesn't prejudice opposing party).

At risk of repetition, the government admits that the BOP is routinely not applying ETCs in a timely manner. (GAB-32; *see* AOB-23 n.4; AOB-30) And it also takes sole responsibility for the situation in which Gonzalez—an individual with a three-and-a-half-year record of successful rehabilitative activities in the community who painstakingly sought timely application of his ETCs through a futile administrative process[8]—now finds himself. (GAB-32; *see* ER-31–32 (outlining factual circumstances supporting the exercise of the district court's equitable authority))

But the government shouldn't be allowed to refuse to apply a congressionally-mandated time-credit scheme to run out the clock and then argue that it is powerless to do anything. This is maybe why the government newly—and rightly—recognizes that Gonzalez's circumstances involve "equitable considerations of great weight[.]" (GAB-32 (quotation omitted)) When the district court initially determined whether to exercise its equitable authority to reduce Gonzalez's term of supervised release, it didn't have the benefit of this Court's guidance on the meaning of the above-discussed provisions, nor an admission from

---

[8] The government has abandoned the meritless exhaustion argument it raised below by failing to address it in its answering brief. *See, e.g.*, *United States v. Dreyer*, 804 F.3d 1266, 1277 (9th Cir. 2015) ("appellee waives any argument it fails to raise in its answering brief").

the government of the extremely "weight[y]" nature of Gonzalez's equitable claims.[9]

A district court that misapprehends the scope of its discretion, or otherwise makes an error of law, necessarily abuses its discretion, and that is what occurred here when the district court refused to exercise its equitable authority. *See, e.g.*, *Mort v. United States*, 86 F.3d 890, 892 (9th Cir. 1996) (district court's refusal to exercise equitable authority is reviewed for abuse of discretion); *see also, e.g.*, *Hunt v. National Broadcasting Co.*, 872 F.2d 289, 292 (9th Cir. 1989) (district court abuses its discretion by applying "[in]correct legal standard" or "misapprehend[ing] the underlying substantive law"). As previously shown, the FSA plainly requires that ETCs be applied to reduce "time in…supervised release[.]" The FSA and the statutes governing supervised release also permit a district court to order such a reduction, even if the BOP cannot. *See Rivera-Perez*,

---

[9] The government's footnoted attempt to seemingly dial back this assertion, stating that Gonzalez "functionally received much of the benefit he could have received" from his ETCs when he was released to home confinement under the CARES Act, is misguided. (GAB-33 n.6) Gonzalez's CARES Act release and his FSA ETCs are two distinct statutory "entitlements"; absent statutory indication to the contrary, there is no reason Gonzalez should be precluded from utilizing his FSA credits because he separately benefitted from the CARES Act. *See, e.g.*, *Rudisill v. McDonough*, 601 U.S. 294, 301 (2024) (describing veterans assistance statutory schemes that provide overlapping entitlements, but specifically required electing benefits); *see also, e.g.*, *United States v. Holden*, 452 F. Supp. 3d 964, 971 (D. Or. 2020) (FSA is "statutory scheme separate" from Second Chance Act).

2024 WL 4819250, at *7 (ordering Probation Office to apply credits toward supervised release in part because "the first sentence of section 3632(d)(4)(C) [directing that "credits…shall be applied toward time in…supervised release"], unlike the second, is not directed at the BOP, but rather uses the passive voice"); *see also* 18 U.S.C. §§ 3601, 3624(e) (providing district court authority to dictate supervised release, as supervised by probation office).

Therefore, should this Court conclude the FSA permits application of ETCs to reduce a term of supervised release, but agree that the BOP cannot provide Gonzalez a remedy, it should vacate the district court's order and either direct the district court to reduce Gonzalez's term of supervised release consistent with its equitable authorities, or remand for reconsideration of Gonzalez's claim for equitable relief in light of the Court's conclusions regarding the FSA's mandate.[10]

---

[10] Alternatively, the Court can remand with direction to modify or reduce Gonzalez's supervised-release term, consistent with his unused ETCs, under 18 U.S.C. § 3583. (GAB-32–33 (acknowledging propriety of Gonzalez seeking section 3583 relief)); *see United States v. Bainbridge*, 746 F.3d 943, 948 (9th Cir. 2014) (district court has "broad discretion" to reduce supervised-release term under section 3583).

## III.  CONCLUSION

The order denying Gonzalez's petition should be reversed, and the case remanded for further proceedings as described above.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: December 17, 2024            By  */s/ Hunter Haney*
                                    HUNTER HANEY
                                    Deputy Federal Public Defender
                                    Attorney for Defendant-Appellant

32

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 24-2371

I am the attorney or self-represented party.

**This brief contains** 7,000 **words, including** 0 **words**

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

[ ] it is a joint brief submitted by separately represented parties.
[ ] a party or parties are filing a single brief in response to multiple briefs.
[ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated [            ].

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Hunter Haney    **Date** 12/17/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

Feedback or questions about this form? Email us at *forms@ca9.uscourts.gov*

**Form 8**                                                                 *Rev. 12/01/22*