**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| LEON ABEL GONZALEZ, *Petitioner - Appellant*, v. JUAN HERRERA, Bureau of Prisons Residential Reentry Manager for Long Beach, in his official capacity; COLETTE S. PETERS, AKA C. Peters, Director of the Federal Bureau of Prisons, in her official capacity, *Respondents - Appellees*. | No. 24-2371 D.C. No. 2:23-cv-10554-DSF OPINION |

Appeal from the United States District Court
for the Central District of California
Dale S. Fischer, District Judge, Presiding

Argued and Submitted March 28, 2025
Pasadena, California

Filed August 19, 2025

Before:  A. Wallace Tashima, Jacqueline H. Nguyen, and
Salvador Mendoza, Jr., Circuit Judges.

Opinion by Judge Mendoza

## SUMMARY[*]

### Habeas Corpus

The panel reversed the district court's order denying Leon Gonzalez's petition for a writ of habeas corpus under 28 U.S.C. § 2241 and remanded with instructions to grant the petition in part, direct the government to recalculate Gonzalez's earned time credits under the First Step Act of 2018, and provide the recalculation to his probation officer.

Gonzalez was on supervised release after serving his custodial sentence, and he had earned First Step Act time credits for participating in recidivism reduction programs while in prison and on home confinement. The government argued that his credits could not be used to reduce the length of his term of supervised release.

The panel held that the plain language of the First Step Act and the relevant canons of construction clearly demonstrated that Congress created the Act's time credit scheme to allow for the reduction in length of a supervised release term.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Hunter Haney (argued), Deputy Federal Public Defender; Cuauhtemoc Ortega, Federal Public Defender; Office of the Federal Public Defender, Los Angeles, California; for Petitioner-Appellant.

Kedar S. Bhatia (argued), Assistant United States Attorney; Mack E. Jenkins, Assistant United States Attorney, Chief, Criminal Division; E. Martin Estrada, United States Attorney; United States Department of Justice, Office of the United States Attorney, Los Angeles, California; for Respondents-Appellees.

## OPINION

MENDOZA, Circuit Judge:

The First Step Act of 2018 ("FSA") was transformative law with far-reaching implications that have yet to all be realized. Pub. L. No. 115-391, 132 Stat. 5194 (2018). This case concerns one such implication: a system to incentivize incarcerated individuals to complete programs intended to reduce their risk of recidivism. As part of this system, Congress created "[t]ime credits" that "shall be applied toward time in prerelease custody or supervised release." 18 U.S.C. § 3632(d)(4)(C).

Petitioner Leon Gonzalez served his custodial sentence. He is now on supervised release and sitting on a heap of FSA time credits that he asks to be applied to reduce the term of his supervised release. The Government argues that those credits are worth nothing—that the time and energy

Gonzalez spent earning credits in excess of his custodial sentence is wasted. We disagree. The plain language of the law and the relevant canons of construction clearly demonstrate that Congress created the FSA's time credit scheme to allow for the reduction in length of a supervised release term in Gonzalez's circumstances. Therefore, we reverse the order dismissing Gonzalez's petition for writ of habeas corpus and remand with further instructions.

## I.

On September 26, 2016, Gonzalez appeared for sentencing on a conviction for conspiracy to distribute controlled substances. Dkts. 940, 941, *United States v. Gonzalez*, 14-cr-684-CAS-33 (C.D. Cal. Sept. 26, 2016). The district court sentenced Gonzalez to 120 months of imprisonment and five years of supervised release. *Id.* Upon the commencement of his sentence, Gonzalez was placed in a medium-security Bureau of Prisons ("BOP") facility.

Two years into Gonzalez's sentence, Congress enacted the FSA. 132 Stat. 5194. Along with a host of other reforms, the FSA directed the Attorney General to create a "risk and needs assessment system" aimed at reducing prisoner recidivism. *Id.* at 5196. Congress instructed the Attorney General to evaluate each prisoner for evidence-based recidivism reduction programming, assign them to appropriate programs, and offer incentives for participation. *Id.* at 5196–97. Congress listed specific incentives including phone and visitation privileges, transfers to another institution, increased commissary, and the big one—time credits. *Id.* at 5197–98. Under Congress's design, prisoners can earn up to 15 days of time credits for every 30 days of participation in recidivism reduction programs or productive activities, depending on their risk level assessments. *Id.* at

5198.  Prisoners could start earning time credits on the date of the FSA's enactment.  *Id.*; *see also* 28 C.F.R. § 523.42(b) (BOP's implementing regulations of the FSA).

Gonzalez took advantage of the program's educational benefits, and as a result, began accruing earned time credits. He participated in classes for business marketing, ceramics, nutrition, leather garment making, and math.  On July 24, 2019, the BOP moved him to FCI Lompoc, a low-security facility.  Then the COVID-19 pandemic swept through the prison population, along with the rest of the country.

On March 27, 2020, Congress responded to the COVID-19 pandemic with the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act").  Pub. L. No. 116-136, 134 Stat. 281 (2020).  The CARES Act allowed the BOP to place a prisoner on home confinement prior to release earlier than usual.  134 Stat. 516.  The BOP did so for Gonzalez on November 19, 2020.  *See* Office of the Attorney General, Memorandum for Director of Bureau Prisons, *Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic* (Mar. 26, 2020), available                                                    at https://www.bop.gov/news/pdfs/20200405_covid-19_home_confinement.pdf (last visited July 24, 2025) (explaining that the BOP director shall evaluate prisoners for home confinement based upon criteria including vulnerability to COVID-19, the inmate's conduct, the inmate's recidivism risk score, and more).

While on home confinement, Gonzalez lived with his sister and mother in Montebello, California, and reported to a halfway house in El Monte, California.  Not wanting to stay idle, Gonzalez continued his FSA-eligible programming.  He got a barbering license and a trucking

6                   GONZALEZ V. HERRERA

permit, and he took electrician and machine-shop courses. Gonzalez's odyssey toward rehabilitation is remarkable and, having earned time credits along the way, he sought to use those credits for early reentry into society.

Respondent Juan Herrera, Residential Reentry Manager for the Long Beach Residential Reentry Management field office ("RRM"), oversaw Gonzalez while he was on home confinement. Nearing the end of his term of imprisonment, in April 2022, Gonzalez emailed *and* mailed a letter to Herrera, requesting information about his earned time credits. Herrera did not respond to Gonzalez's request. Luckily, the Federal Public Defender's office contacted the BOP on Gonzalez's behalf and asked for Gonzalez's release date to account for his earned time credits. In July 2023, a BOP supervising attorney responded, claiming that the BOP had no record of an administrative remedy request. The next day, Gonzalez completed an administrative remedy form, requesting reevaluation of his PATTERN score[1] and recalculation of his earned time credits. He mailed the form to his RRM and a BOP administrative office. Once more, no response. As a result, Gonzalez then submitted a "regional administrative remedy appeal" form, asking for the same relief. Gonzalez yet again received no response from

---

[1] The BOP calculates recidivism risk through a "Prisoner Assessment Tool Targeting Estimated Risk and Needs" score. BOP, *PATTERN Risk Assessment*, available at https://www.bop.gov/inmates/fsa/pattern.jsp (last visited July 24, 2025). Gonzalez's score was 32, which the BOP marked as "medium" risk, though Gonzalez argues that under a newer version of the PATTERN system, he should have been "low" risk. Gonzalez's score determines how many credits he accrues for each day of participation in risk reduction activities. 18 U.S.C. § 3632(d)(4)(A). Because the parties agree on the number of earned time credits that Gonzalez ultimately accrued, we consider the discrepancy no further.

the BOP, and so he completed a "central office administrative remedy appeal" form, which he mailed to the BOP's national office in Washington, D.C. Unsurprisingly, the BOP never responded to Gonzalez's administrative appeals. Instead, the record indicates that on November 27, 2023, the BOP closed his remedy request, with an internal note remarking, "since you are on home confinement, you need to begin your appeal with the RRM."

After a fruitless attempt to go through the BOP's administrative process, and having exhausted his administrative remedies, Gonzalez reached for his last resort and filed his petition for habeas corpus pursuant to 28 U.S.C. § 2241 against Herrera and the BOP director (collectively "the Government"). When he filed his petition, his release date was calculated as September 26, 2024. He petitioned to have his earned time credits applied to end his home confinement and for his remaining earned time credits to be applied to reduce the length of his supervised release term.

On February 2, 2024, while Gonzalez's habeas petition was pending, the BOP released him from custody, applying 237 of his 610 days of earned time credits to end his custodial sentence. This leaves Gonzalez with 373 days of unused earned time credits. The Government filed an opposition to his habeas petition a week later, arguing that insofar as Gonzalez's petition sought an end to his custodial sentence, his request was moot and that his earned time credits cannot reduce the length of his term of supervised

8          GONZALEZ V. HERRERA

release.  On April 2, 2024, the district court dismissed his petition.[2]  Gonzalez appeals.

## II.

We have jurisdiction over a district court's denial of a habeas corpus petition pursuant to 28 U.S.C. §§ 1291 and 2253.  We review the denial of a habeas corpus petition and questions of statutory interpretation de novo.  *Bottinelli v. Salazar*, 929 F.3d 1196, 1198–99 (9th Cir. 2019) (citing *Stephens v. Herrera*, 464 F.3d 895, 897 (9th Cir. 2006) and *Chemehuevi Indian Tribe v. Newsom*, 919 F.3d 1148, 1151 (9th Cir. 2019)).[3]

## III.

A thin slice of the United States Code controls this case. 18 U.S.C. § 3632 codifies the FSA's mandate for a risk and needs assessment system, subsection (d) provides incentives for prisoners to participate, and subsubsection (4) creates earned time credits.  Subsubsubsection (C) is entitled

---

[2] On February 18, 2025, Gonzalez moved for early termination of supervised released in his criminal case, arguing in part that his sentencing judge should consider his earned time credits.  Dkt. 2419, *Gonzalez*, 14-cr-684-CAS-33 (C.D. Cal. Feb. 18, 2025).  His sentencing judge denied his motion on March 24, 2025.  Dkt. 2461, *Gonzalez*, 14-cr-684-CAS-33 (C.D. Cal. Mar. 24, 2025).  He appealed, which is Ninth Circuit Case No. 25-2245.

[3] Gonzalez's release from the custody of the BOP does not moot his petition, as he still seeks relief from supervised release.  *See Mujahid v. Daniels*, 413 F.3d 991, 994 (9th Cir. 2005) ("[A] habeas petitioner remains in the custody of the United States while on supervised release.").

"[a]pplication of time credits toward prerelease custody or supervised release," and reads:

> Time credits earned under this paragraph by prisoners who successfully participate in recidivism reduction programs or productive activities shall be applied toward time in prerelease custody or supervised release. The Director of the Bureau of Prisons shall transfer eligible prisoners, as determined under section 3624(g), into prerelease custody or supervised release.

18 U.S.C. § 3632(d)(4)(C).

Divergent interpretations of this language have led litigants and courts to opposing conclusions concerning its effect. Some courts have reasoned that "[a]pplying credits toward something ordinarily means reducing that thing," and therefore the FSA "allows credits to be applied to reduce a term of (i.e., 'time in') . . . supervised release[.]" *Rivera-Perez v. Stover*, 757 F. Supp. 3d 204, 211–12 (D. Conn. 2024); *see also Dyer v. Fulgam*, 21-CV-299, 2022 WL 1598249, at *3 (E.D. Tenn. May 20, 2022). Others have held that to apply earned time credits "toward time in . . . supervised release" means to "bring an inmate closer to . . . supervised release by reducing their time in prison." *United States v. Doost*, 22-CR-4466, 2024 WL 2064062, at *3–4 (N.D. Cal. May 7, 2024). Under their reasoning, earned time credits can shorten a custodial sentence and no more. *Id.*; *see also Guerriero v. Miami RRM*, 24-10337, 2024 WL 2017730, at *2 (11th Cir. May 7, 2024) (per curiam); *United States v. Calabrese*, 11-CR-437, 2023 WL 1969753, at *2–4 (N.D. Ohio Feb. 13, 2023).

Splits in authority are seldom so stark and consequential, but we have little difficulty reaching a conclusion. From the plain text and canons of construction, it is clear that Congress intended for the FSA's earned time credits to reduce a prisoner's supervised release term. To conclude otherwise, as the Government urges us to do, would require bending and twisting the statutory language and reading incongruence into criminal statutes. We decline to do so and instead rest upon a reading coherent with the plain text inquiry and context.

## A.

"When interpreting a statute, we look first to its text." *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1133 (9th Cir. 2009) (citing *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)). We must "'generally give words their ordinary, contemporary, common meaning.'" *United States v. Korotkiy*, 118 F.4th 1202, 1210 (9th Cir. 2024) (quoting *Pakootas v. Teck Cominco Metals, Ltd.*, 830 F.3d 975, 980 (9th Cir. 2016)). "If the 'statutory text is plain and unambiguous[,]' we 'must apply the statute according to its terms.'" *Guido v. Mount Lemmon Fire Dist.*, 859 F.3d 1168, 1170 n.1 (9th Cir. 2017), *aff'd*, 586 U.S. 1 (2018) (quoting *Carcieri v. Salazar*, 555 U.S. 379, 387 (2009)). But "'[i]f the statute's terms are ambiguous, we may use canons of construction, legislative history, and the statute's overall purpose to illuminate Congress's intent.'" *Ileto*, 565 F.3d at 1133 (quoting *Jonah R. v. Carmona*, 446 F.3d 1000, 1005 (9th Cir. 2006)); *see also Korotkiy*, 118 F.4th at 1210 ("[W]e must rifle through our 'legal toolkit' and 'carefully consider the text, structure, history, and purpose' of the regulation to derive its meaning." (cleaned up) (quoting *Kisor v. Wilkie*, 588 U.S. 558, 575 (2019))).

11

We begin with the dictionary. *See United States v. Flores*, 729 F.3d 910, 914 (9th Cir. 2013). Most of the linguistic wrestling in this dispute concerns the meaning of *toward*, which the statute (understandably) leaves undefined. Those arguing that Congress meant for earned time credits to bring supervised release closer, rather than reduce its term, look to definitions of *toward* such as "in the direction of," *Toward*, Black's Law Dictionary (10th ed. 2014), or "along a course leading to," *Toward*, Webster's Third New International Dictionary of the English Language 2417 (2002); *see also Toward*, Oxford English Dictionary, https://doi.org/10.1093/OED/4426685120 (last visited July 24, 2025) ("In the direction of, on the way to . . . ."). The argument then goes that the statute should read, "time credits shall be applied in the direction of time in supervised release." Under this interpretation, time credits are applied to reduce the time *preceding* supervised release, rather than time *in* supervised release, so as to merely bring it closer rather than reduce its duration. This framing collapses under the weight of scrutiny.

To start, *toward* has other definitions that are far more compatible with the rest of the statutory language. As Gonzalez identifies, *toward* also means "for the partial payment of," *Toward*, Webster's Third New International Dictionary of the English Language 2417 (2002), or "[i]n contribution to," *Toward*, Oxford English Dictionary, https://doi.org/10.1093/OED/4426685120 (last visited July 24, 2025). This definition fits snugly and requires no cajoling to offer meaning to the rest of the language.

"A word is known by the company it keeps (the doctrine of *noscitur a sociis*)," *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995), therefore we must round out the rest of the relevant definitions. A *credit* is a clear reference to "the

balance in a person's favor in an account," or "an amount or sum placed at a person's disposal by a bank." *Credit*, Webster's Third New International Dictionary of the English Language 532–33 (2002). To *earn* is "to receive as equitable return for work done or services rendered." *Earn*, Webster's Third New International Dictionary of the English Language 714 (2002). As a noun, *time* is "a period during which something (as an action, process, or condition) exists or continues" or "a measured or measurable duration." *Time*, Webster's Third New International Dictionary of the English Language 2394–95 (2002). And as an adjective, it is simply "of or relating to time." *Id.* Finally, when something is *applied*, it is "put to use especially for some practical purpose," "br[ought] into action," or "l[aid] or spread on." *Apply*, Webster's Third New International Dictionary of the English Language 105 (2002).[4]

Equipped with these definitions, the phrase "[t]ime credits . . . shall be applied toward time in prerelease custody or supervised release" produces three very clear ideas. 18 U.S.C. § 3632(d)(4)(C). First, earned time credits are an amount placed at a prisoner's disposal—a store of value (measured in days) that incarcerated individuals receive as a return for their participation in qualified programs. This notion fits smoothly with the definition of *toward* as "for the

---

[4] "[T]he title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute." *Dubin v. United States*, 599 U.S. 110, 120–21 (2023). Section 3632(d)(4)(C) is entitled "application of time credits toward prerelease custody or supervised release." "Application" is defined as "the act of applying" or "the act of laying on or bringing into contact." *Application*, Webster's Third New International Dictionary of the English Language 105 (2002). Therefore, the statute must concern "an act of laying" time credits on prerelease custody or supervised release.

partial payment of"—invoking the familiar idea of working to increase a bank account balance, which can then *be applied toward* a car loan, mortgage, or other debt obligation. Second, the statute specifically says that earned time credits shall be applied toward "time *in* prerelease custody or supervised release." 18 U.S.C. § 3632(d)(4)(C) (emphasis added). Time *in* supervised release is the "period during which [supervised release] exists or continues." It is elegantly consistent, then, to apply earned time credits "for the partial payment of" that "measurable duration." Finally, and most obviously, the credits are *time* credits that shall be applied toward *time*. Not only does the statute indicate that earned time credits store value, but it also identifies a commodity for which they can be redeemed: *time*.[5] With this context in mind, we are confident that Congress meant to say "for the partial payment of" when it used the word *toward*.

Returning to the Government's chosen definition, if we were to assume that *toward* meant "in the direction of," the statute's language would become gobbledygook: "Time credits shall be applied [in the direction of] time in prerelease custody or supervised release." 18 U.S.C. § 3632(d)(4)(C). How does one apply credits "in the direction of" time—are we meant to wave them towards the future? The Government advocates for applying time credits to reduce the time *preceding* supervised release. But § 3632(d)(4)(C) does not mention the period of time preceding supervised release, it identifies only "time *in* prerelease custody or

---

[5] The parties do not dispute, and we agree, that when the statute refers to "time in prerelease custody and supervised release," it means "time in prerelease custody" as well as "time in supervised release." 18 U.S.C. § 3632(d)(4)(C).

supervised release." *Id*. (emphasis added). All the excess conceptual baggage the Government injects into the language—"accelerat[ing] the beginning of" supervised release, or "bringing the defendant closer to his time in supervised release"—is simply not there.

Moreover, the dispute over the meaning of the preposition *toward* fails to take into consideration the meaning of the transitive verb—*applied*. Whatever definition we give to the preposition must fit with the verb; prepositions give verbs direction. Therefore, drawing on the dictionary definitions discussed above, earned time credits must be "put to use" for, "brought into action" for, or "laid or spread on" time in supervised release. *Apply*, Webster's Third New International Dictionary of the English Language 105 (2002). The language Congress used in § 3632(d)(4)(C) demands that time credits must be applied to time in supervised release somehow. All that *toward* can do is tell us how they get there or what they do when they arrive. The language is quite simple: They are applied "for the partial payment of" time in supervised release.

Therefore, heeding § 3632(d)(4)(C)'s plain language, we conclude that earned time credits shall be applied to reduce the length of a supervised release term. This is not the first time we have explained this simple notion. In 2019, we observed that "under the [FSA's] new 'risk and needs assessment system,' receiving earned time credit can potentially shorten prerelease custody or supervised release." *Bottinelli*, 929 F.3d at 1200 (quoting 132 Stat. 5198). Although we conclude now, as we implied in dicta then, that the statutory language is unambiguous, some

courts have disagreed.[6]   Out of respect for the split in authority, we shall apply the relevant interpretive tools toward the statute's language to better understand its meaning.

## B.

The parties each argue that the canons on interpretation support their position.  We find no need to exhaust the interpretive playbook.  The most relevant canons for this dispute concern understanding the statute's language (1) in light of what Congress chose not to include, (2) in statutory context, and (3) considering the law's purpose.[7]

### *1.*

Applying these conventional principles, we must assume "that Congress acts intentionally when it omits language included elsewhere." *Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 392 (2015).   In 18 U.S.C. § 3624(b)(1),

---

[6] The Fourth Circuit has found that "[u]nder the FSA, the time credits can be applied toward earlier placement in pre-release custody or supervised release." *Valladares v. Ray*, 130 F.4th 74, 79 (4th Cir. 2025). The Third Circuit has seemed to suggest that credits leftover after advancing a release date by 12 months would remain unused. *Malik v. Warden*, 23-2281, 2024 WL 3649570, at *2 (3d Cir. Aug. 5, 2024) (per curiam).  The Eleventh Circuit held that "Congress meant that the time credits are to be used to reduce incarceration time so as to accelerate the beginning of prerelease custody or supervised release." *Guerriero*, 2024 WL 2017730, at *2; *see also Stinson v. Martinez*, 24-30793, 2025 WL 2017872, at *1 (5th Cir. July 18, 2025) (per curiam) ("The FSA further provides that [earned time credits] may only be applied towards an early start of supervised release or early transfer to pre-release custody.").

[7] Beyond these, Gonzalez invokes the rule of lenity, the Government urges deference to BOP regulations, and both claim that legislative history is on their side.  We have considered each of these arguments and summarily conclude they are not persuasive or necessary for disposition.

another law creating time credits, Congress specifically identified that "a prisoner who is *serving a term of imprisonment* of more than 1 year other than a term of imprisonment for the duration of the prisoner's life[] may receive credit toward *the service of the prisoner's sentence.*" (emphasis added). There, Congress intended for time credits to reduce only custodial time, and it effectuated that goal with clear language. By contrast, in § 3632(d)(4)(C), Congress chose to say that the time credits "shall be applied toward time in prerelease custody or supervised release," rather than "shall be applied toward the service of the prisoner's sentence."

Congress knows how to write a law creating time credits that only apply to custodial time; it did so with § 3624(b)(1). With § 3632(d)(4)(C), Congress's choice of words necessarily indicates that earned time credits do more. *MacLean*, 574 U.S. at 391–92; *see also Jama v. ICE*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest."). The Government's position effectively asks us to invent language not written in the statute and twist Congress's words to limit earned time credits' use to custodial time. We decline to do so and instead heed Congress's inclusion of other uses for earned time credits and its omission of further limiting language.

*2.*

We turn to discuss the three different statutory contexts surrounding § 3632(d)(4)(C): the whole of the subsubsubsection; language found elsewhere in the code;

and the statutory framework surrounding sentencing and imprisonment. Each context further supports our conclusion as to the statute's meaning.

i.

Many who conclude that § 3632's earned time credits may not be applied to reduce a term of supervised release have argued that § 3632(d)(4)(C)'s second sentence cabins the meaning of the first:

> Time credits earned under this paragraph by prisoners who successfully participate in recidivism reduction programs or productive activities shall be applied toward time in prerelease custody or supervised release. *The [BOP Director] shall transfer eligible prisoners, as determined under section 3624(g),[8] into prerelease custody or supervised release.*

18 U.S.C. § 3632(d)(4)(C) (emphasis added). The Government argues that because the second sentence directs the BOP to transfer prisoners into prerelease custody or supervised release, the first sentence is meant to authorize use of earned time credits only for those purposes. *See also Guerriero*, 2024 WL 2017730, at *2.

The starkest issue with the Government's position is that it renders the second sentence redundant of the first, and we must "avoid a reading which renders some words altogether

---

[8] Section 3624(g) explains a number of things, including who is an "eligible prisoner," the qualifying types of prerelease custody, and when the BOP may release a prisoner to supervised release based on earned time credits (no more than 12 months early). 18 U.S.C. § 3624(g)(3).

redundant." *Gustafson*, 513 U.S. at 574. Under the Government's reading, § 3632(d)(4)(C) says that (1) earned time credits shall be applied to accelerate prerelease custody or supervised release and (2) BOP shall apply earned-time credits to accelerate prerelease custody or supervised release. This forced redundancy is unnecessary and difficult to comprehend.

On the contrary, § 3632(d)(4)(C) clearly does two distinct things, each concerning the "[a]pplication of time credits toward prerelease custody or supervised release." *Id.* § 3632(d)(4)(C) (title). First, it declares that earned time credits shall reduce time in prerelease custody or supervised release, separate and apart from imprisonment. Second, § 3632(d)(4)(C) directs the BOP to put the prisoner on prerelease custody or place him on supervised release (cashing in earned time credits to do so) when a prisoner becomes "eligible." *See* 18 U.S.C. §§ 3624(g), 3632(d)(4)(C).

The fact that Congress chose not to name who will do the "applying" in the first sentence, but did so for the second, is another clue. The second sentence identifies the BOP Director because the BOP Director is the officer in charge of placing prisoners on prerelease custody and releasing them. *See* 18 U.S.C. § 3624(a), (c)(1). The first sentence does not mention the BOP because the BOP has no power to reduce a supervised release term. In other words, the BOP could not "apply" earned time credits toward time in supervised release even if Congress commanded it to do so (at least not without substantial editing to how sentences work). *Id.* § 3624(a). But the BOP can, and indeed must, transfer eligible prisoners into prerelease custody or supervised release based on the application of their earned time credits. *Id.* § 3632(d)(4)(C).

Accordingly, if Congress was speaking only to the BOP when it declared that time credits "shall be applied toward time in prelease custody or supervised release," it could have—and we think would have—said so. *Id.* Instead, § 3632(d)(4)(C) clearly tells us (1) what the time credits can do, and (2) that the BOP needs to apply time credits to move people into prerelease custody and supervised release. Such a reading avoids redundancy and is consistent with a plain reading of the statute's language.

ii.

Beyond the subsubsubsection at issue, we must also interpret the FSA to be consistent with itself, as well as with preexisting sections of the statute. *Miranda v. Anchondo*, 684 F.3d 844, 849 (9th Cir. 2012) ("[U]nder the doctrine of *in pari materia*, words in different sections of the same statute should be construed similarly." (citing *Erlenbaugh v. United States*, 409 U.S. 239, 243–44 (1972))). The FSA and its neighboring statutes are replete with comparable language that cements our understanding.

When the FSA added Subchapter D to Title 18, chapter 229, it also amended § 3624(b). 132 Stat. 5210. Section 3624(b)(1) now reads:

> [A] prisoner who is serving a term of imprisonment of more than 1 year other than a term of imprisonment for the duration of the prisoner's life, *may receive credit toward the service of the prisoner's sentence of up to 54 days for each year of the prisoner's sentence imposed by the court*, subject to determination by the Bureau of Prisons that, during that year, the prisoner has displayed

> exemplary compliance with institutional disciplinary regulations. (emphasis added).

As briefly mentioned above, § 3624(b)(1) creates a system of "good time credits" where the BOP may shorten a prisoner's term of imprisonment for good behavior while in prison. *See Bottinelli*, 929 F.3d at 1197–98.

In both § 3632(d)(4)(C) and § 3624(b)(1), Congress used the word "toward" to describe how to use time credits. Any attempt to shoehorn the Government's proffered definition of "toward" into § 3624(b)(1) renders the statute incomprehensible: "a prisoner . . . may receive credit [on a course leading to] the service of the prisoner's sentence of up to 54 days . . . ." Applying the Government's logic, the prisoner is thereby bringing "the service of [his] sentence" closer. To receive good time credits, the prisoner must have already started the service of his or her sentence—how could it be brought closer? The Government finds significant that § 3632(d)(4)(C) uses the phrase "applied toward," as opposed to § 3624(b)(1)'s "credit toward," but fails to elaborate on the distinction. We find no significance in it— § 3624(b)(1) explains what the prisoner is receiving, and § 3632(d)(4)(C) explains what credits are used for. The difference in language is simply reflective of how Congress chose to frame the statutes.

We must define "toward" consistently between the sections as both appear in the same statute, were amended or added under the FSA, and both concern a credit system created for the benefit of prisoners. Further, § 3624(b)(1)'s good time credit system and § 3632's risk and needs assessment system are "generally related"; it would be improper to interpret their language differently. *Bottinelli*,

929 F.3d at 1200.  The obvious and consistent meaning of both sections is that:

> "a prisoner . . . may receive credit [for the partial payment of] the service of the prisoner's sentence,"
>
> and
>
> "time credits earned . . . shall be applied [for the partial payment of] time in prerelease custody or supervised release."

18 U.S.C §§ 3624(b)(1), 3632(d)(4)(C).  To hold otherwise would be to sew discord into the federal sentencing laws and the many means by which prisoners get credit towards their sentence.  *See, e.g.*, 18 U.S.C. §§ 3585(b) ("A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences."), 4105(b) ("The transferred offender shall be given credit toward service of the sentence for any days . . . spent in custody in connection with the offense or acts for which the sentence was imposed."), 4114(e) ("The return of an offender shall be conditioned upon the offender being given credit toward service of the sentence for the time spent in the custody of or under the supervision of the United States.").

At bottom, Congress is well versed in federal sentence crediting schemes and the language used for such laws.  Our deference to the legislature requires us to conclude that when Congress used the word *toward*, it did so with the same definition as used in preexisting laws.

iii.

We conclude our contextual analysis by zooming out to view how the statute fits into the statutory backdrop for sentencing, imprisonment, and release.

When a defendant is sentenced to a term of imprisonment by a federal district court, he or she is committed to BOP custody until that term expires. 18 U.S.C. § 3621(a). The BOP maintains discretion in the administration of imprisonment, though Congress imposes certain duties like the provision of rehabilitative programs. *See, e.g.*, *id.* § 3621(e)–(f) (substance abuse treatment and sex offender management). The BOP must "ensure that a prisoner . . . spends a portion of the final months of that term (not to exceed 12 months), under conditions that will afford that prisoner a reasonable opportunity to adjust and prepare for the reentry of that prisoner into the community." *Id.* § 3624(c)(1). This phase is called "prerelease custody," and may involve residence at a community correctional facility or home confinement. *Id.* The BOP must release prisoners "on the date of the expiration of the prisoner's term of imprisonment, less any time credited toward the service of the prisoner's sentence" for good time as set out in § 3624(b). *Id.* § 3624(a).

A federal district court might also impose a sentence of supervised release following imprisonment (and indeed, most do). *See* 18 U.S.C. § 3583(a); United States Sentencing Commission, Federal Offenders Sentenced to Supervised Release 8 (July 2010) ("Over 95 percent of offenders [with a Criminal History Category I through VI] who were sentenced to prison received terms of supervised release."). For certain crimes like Gonzalez's, Congress mandates a sentence including a term of supervised release. 21 U.S.C.

§ 841(b)(1)(A).    When the prisoner finishes a term of imprisonment, he or she is "released by the [BOP] to the supervision of a probation officer who shall . . . supervise the person released to the degree warranted by the conditions specified by the sentencing court."  18 U.S.C.  § 3624(e). The sentencing court imposes conditions of release and may modify those conditions throughout the supervised release term, extend the term up to the statutory maximum, revoke supervised release, or end it early.  *See id.* § 3583(d)–(e).

The FSA changed some things.  To start, the FSA gave the BOP another duty:  administering the "risk and needs assessment system" described above.  *Id.* § 3621(h).  It waives the 12-month-before-release-date limit for persons who have earned FSA time credits amounting to the remainder of their term of imprisonment.  *Id.* § 3624(g)(10). The BOP may now apply time credits to put a prisoner on prerelease custody for the remainder of their sentence, as soon as he or she has earned enough time credits.

Our interpretation of § 3632(d)(4)(C) fits well into this broader framework.  The Government argues that, because the FSA permits an earlier start to prerelease custody, reading § 3632(d)(4)(C)'s first sentence to allow a reduction of that time would render that provision irrelevant.  Not so. The second sentence specifically directs the BOP to transfer prisoners into prerelease custody (or supervised release) when they become eligible.  Doing so spends earned time credits.  Then, when the prisoner has only a year of custody remaining, the BOP shall transfer the prisoner into supervised release, again spending earned time credits to end prerelease custody early.  Leftover earned time credits may then be applied to reduce their supervised release term.  As a result, a prisoner may readily get the benefit of § 3624(g)(10)'s expansion of prerelease custody time

24 GONZALEZ V. HERRERA

alongside § 3632(d)(4)(C)'s application of earned time credits toward supervised release.

The Government also argues that earned time credits cannot be applied to reduce supervised release because the FSA "contains no procedure to implement such a result." The FSA was enacted into a well-trod and flexible statutory scheme for supervised release, and when "'[f]aced with statutory silence . . . , we presume that Congress is aware of the legal context in which it is legislating.'" *Abbey v. United States*, 112 F.4th 1141, 1153 (9th Cir. 2024) (quoting *Progressive W. Ins. Co. v. Preciado*, 479 F.3d 1014, 1018 (9th Cir. 2007)). There is no basis to obviate the law's plain language simply because the Government would like more detail on its operation. In sum, § 3632(d)(4)(C) fits neatly into the federal sentencing framework, and the interpretation we reach causes no friction with the preexisting system.

*3.*

We also consider a statute's "purpose . . . to derive its meaning." *Korotkiy*, 118 F.4th at 1210; *see also United States v. Abhijit Prasad*, 18 F.4th 313, 322 (9th Cir. 2021) ("We favor an interpretation of a statute that furthers and does not obstruct the statute's purpose." (citing *Burns v. Stone Forest Indus.*, 147 F.3d 1182, 1184 (9th Cir. 1998))).

The FSA imposed a duty on the Attorney General to create a system of evidence-based recidivism reduction programs, aimed at reducing recidivism. 18 U.S.C. § 3632. Congress provided "incentives" and "rewards" for prisoners for participating in such programs. *Id.* § 3632(d). Congress directed the Attorney General to produce a report on how effective these programs are at reducing recidivism and cost. *Id.* § 3634. Section 3632(d)(4)(C)'s language should

therefore be interpreted in a manner that serves these purposes. *Abhijit Prasad*, 18 F.4th at 322.

It then follows that earned time credits should maintain utility as an incentive for prisoners to continue programming, thereby reducing recidivism and the cost of managing the nation's incarcerated and supervised population. The Government's interpretation allows for earned time credits to lose their worth as an incentive. For instance, a prisoner can participate in programming when on prerelease custody (as Gonzalez did). *See* FSA Time Credits, 87 Fed. Reg. 2705, 2712 (Jan. 19, 2022). If he has no hope of applying earned time credits to reduce his term of supervised release, any credits earned in excess of 365 days are worthless because they may only be applied to end custody one year early. *See id.* § 3624(g)(3). But if earned time credits could reduce time in imprisonment, in prerelease custody, or in supervised release, their incentive value is maximized. That is the interpretation that best serves the purposes of the statute.

The Government disagrees, arguing that the purposes of supervised release would be unfulfilled if unused time credits were used to reduce a term of supervised release, citing *United States v. Johnson*, 529 U.S. 53, 59 (2000). The Supreme Court explained in *Johnson* that "[s]upervised release fulfills rehabilitative ends, distinct from those served by incarceration." *Id.* The issue was whether "excess prison time . . . offset and reduce[d] terms of supervised release." *Id.* The Supreme Court found that supervised release helps individuals transition to community life, so the purposes of § 3624(e) (providing for supervision after release) would be hindered if an unduly extended prison sentence reduced a prisoner's term of supervised release. *Id.* at 59–60.

26 GONZALEZ V. HERRERA

There is no similar friction in purpose here. Supervised release and the FSA's earned time credits system serve the same end. The prisoner who earns credits is rehabilitating, sensibly reducing his need for supervised release. The Government's argument to the contrary is a simple second-guessing of Congress's chosen path of reaching the twin goals of rehabilitation and reduced recidivism following release from imprisonment. We defer to Congress's policy choices in pursuing prisoner rehabilitation and reducing recidivism. *See Schroeder ex rel. United States*, 793 F.3d 1080, 1083 (9th Cir. 2015) (rejecting an argument that "urges us to untenably assume the role of a superlegislature second-guessing the policy choices of the other branches of government" (cleaned up)).

Fundamental canons of construction require that we pay mind to what Congress did and did not say, look to the context of the law, and to legislative purpose. Beyond the language of the statute, which we consider fairly plain and unambiguous, these canons each strongly indicate the same conclusion—that the FSA's time credits may be used to reduce the length of time that a prisoner must spend while on supervised release.

## C.

The Government offers a parade of horribles over the instant ruling. It insists that earned time credits may "be used to reduce the total time on supervision for an inmate who was deemed too risky to obtain early transfer out of prison." The Government fears that "defendants who served the lengthiest terms of imprisonment . . . would be most likely to have their terms of supervised release eliminated altogether, leaving them without the reintegrative benefits of supervised release." These policy arguments are unavailing

and in the normal case we would dismiss them without comment, yet in light of the rhetoric and fractured authority on the subject, we find it appropriate to explain why these concerns are largely overblown.

There is no boogie man here. To start, prisoners convicted of many of the most serious crimes are statutorily excluded from earning FSA time credits. 18 U.S.C. § 3632(d)(4)(D) (e.g., drive-by shootings, assaulting officers with deadly weapons, certain homicides, sexual abuse, and dozens of others). Thus, even if these prisoners pursued recidivism reduction programs, there is no risk of a premature end to their terms of supervised release. Further, to be released early, the prisoner must be found to be at a minimum or low risk level. *Id.* §§ 3624(g)(1)(B), 3632(d)(4)(C). It is therefore highly inappropriate (and illogical) to presume that the prisoners that might be let off supervised release early present a heightened or unwarranted level of risk, as the Government suggests.

Moreover, the Government disregards the degree of discretion that the BOP has in executing the FSA's risk and needs assessment system. As soon as someone in prison earns enough time credits to carry them through the end of his term of imprisonment, the BOP has a choice between prerelease custody *or* supervised release. *Id.* § 3632(d)(4)(C). It must choose one, but there are attendant conditions for each, which aim to ensure only appropriate prisoners are sent into the community. *See id.* § 3624(g). Congress left that responsibility to the discretion of the BOP, which we expect it will exercise wisely. As it pertains to a reduction of supervised release, however, the BOP has no role, and the Government's sky-is-falling argument is not persuasive. The Government simply disagrees with the policy chosen by Congress, and "it is not [the court's] role

to choose what [it] think[s] is the best policy outcome and to override the plain meaning of a statute, apparent anomalies or not." *Guido*, 859 F.3d at 1175. We decline the invitation to legislate, and worse, to legislate against Congress's will.

## IV.

The district court misapplied § 3632(d)(4)(C). Therefore, the district court's order dismissing Gonzalez's petition for writ of habeas corpus under 28 U.S.C. § 2241 is **REVERSED** and **REMANDED** with instructions to grant the petition in part, direct the Government to recalculate Gonzalez's earned time credits, and provide the recalculation to Gonzalez's probation officer.